## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Civil Action Number:

BORINQUEN HEALTH CARE
CENTER, INC., a Florida not-for-profit corporation,

      Plaintiff,

vs.

ICARE RX LLC, a Florida limited liability company
and HEALTHCAP SOLUTIONS, LLC,
a Delaware limited liability company

      Defendants.

---

## COMPLAINT

---

BORINQUEN HEALTH CARE CENTER, INC. ("Borinquen") hereby sues Defendants, ICARE RX LLC ("iCare") and HEALTHCAP SOLUTIONS, LLC ("Healthcap") and alleges as follows:

### JURISDICTION & VENUE

1.     This Honorable Court has diversity jurisdiction pursuant to 28 USC § 1332, the matter in controversy in this civil action exceeds the sum or value of $75,000; exclusive of interest and costs and Federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2.     Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. § 2201 and further relief pursuant to 28 U.S.C. § 2202.

3.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Southern District of Florida is where a substantial part of the events or omissions giving rise to the claims occurred.

## THE PARTIES

4.      Pursuant to Section 330 of the Public Health Service Act, 42 U.S.C. § 254b, Plaintiff BORINQUEN HEALTH CARE CENTER, INC. ("Borinquen") is a Federally Qualified Health Center ("FQHC") incorporated as a Florida Not-For-Profit Corporation which operates community health centers throughout Miami-Dade County, Florida. Borinquen is also a 501(c)(3) tax exempt entity duly licensed to own and operate its own pharmacy.

5.      ICARE RX LLC is a Florida Limited Liability Company, which at all times material hereto, owns, manages and maintains a community pharmacy located at 14447 Country Walk Dr., Miami, FL 33186.

6.      HEALTHCAP SOLUTIONS, LLC is a Delaware Limited Liability Company which at all times material hereto, provides inventory financing services to FQHCs and other healthcare organizations.

## BACKGROUND

7.      As a Federally Qualified Health Center, Borinquen serves the uninsured, underinsured and medically underserved populations pursuant to various federal healthcare programs and provides pharmacy services in accordance with the Public Health Service Act 340B drug discount program. (42 U.S.C. § 254b). Pursuant to Federal law, Borinquen cannot turn away any patients due to an inability to pay.

8.      The U.S. Department of Health and Human Services' Health Resources Administration ("HRSA") regulates all aspects of Borinquen's operations in accordance with the Health Center Program Statute (42 U.S.C. § 254b, et. seq.), including its required services, (§ 330(h)(2) of the PHS Act), staffing requirements, (§ 330(a)(1), (b)(1)-(2), (k)(3)(C)), and (k)(3)(I)), hours of operation and locations, (§ 330(k)(3)(A)), patient sliding fee discounts, (§ 330(k)(3)(G), 42 CFR 51c.303(f)), and 42 CFR 51c.303(u)), the key management staff, (§ 330(k)(3)(I), 42 CFR 51c.303(p) and 45 CFR 74.25(c)(2),(3)), the permissible contractual/affiliation agreements, (§ 330(k)(3)(I)(ii), 42 CFR 51c.303(n), (t)), § 1861(aa)(4) and § 1905(l)(2)(B) of the Social Security Act, and 45 CFR 74.1(a) (2)), as well as its collaborative relationships with other entities, (§ 330(k)(3)(B).

9.      HRSA also regulates Borinquen's permissible Scope of Project, (45 CFR 74.25), the budgetary requirements to accomplish the service delivery plan, (§ 330(k)(3)(D), § 330(k)(3)(I)(i), and 45 CFR 74.25), financial management and control policies; including Federal audit requirements, (§ 330(k)(3)(D), § 330(q) and 45 CFR 74.14, .21, .26), methodology for billing and collections, (§ 330(k)(3)(F) and (G)), program data reporting, (§ 330(k)(3)(I)(ii)), the legal authority and composition of its Board of Directors, (§ 330(k)(3)(H) and 42 CFR 51c.304) the conflict of interest policy, (45 CFR 74.42) as well as its pharmacy operations, 42 U.S.C. § 254b.

10.     Borinquen's services currently include: General Primary Medical Care, Gynecological Care, Obstetrical Care, Prenatal Care, Postpartum Care, Pediatrics, HIV Treatment and Prevention, Behavioral and Mental Health, Substance Abuse, Diagnostic Laboratory and Radiology, Screenings, Immunizations, Podiatry,

Dentistry, Speech Language, Pathology/Therapy, Nutrition, Case Management, Eligibility Assistance, Health Education, Community Outreach, Transportation, and Pharmacy Services.

## THE 340B PROGRAM

11.     As a condition of payment for covered outpatient drugs by Medicaid, manufacturers are legally required to enter into contracts with the U.S. Department of Health and Human Services (HHS) to sell their drugs to eligible "Covered Entities," at a deeply discounted statutory price, referred to as the 340B price. 42 U.S.C. § 256b.

12.     As a Federally Qualified Health Center, Borinquen is a "Covered Entity" eligible to participate in the Public Health Service 340B Drug Discount Program which is overseen and regulated by HRSA's Office of Pharmacy Affairs. 42 U.S.C.§ 256b (4)(A).

13.      As a FQHC Covered Entity, Borinquen purchases medicines for its patients under the 340B program at substantially reduced prices; calculated under a complex formula established by the Secretary of HHS, which results in drug costs that are 50% or more below the average wholesale price. See: 42 U.S.C. § 256b (d)(1)(B)(iv)(II).

14.     The 340B discounts are intended to help Covered Entities, such as Borinquen, reduce costs and use the savings to provide more care to indigent and uninsured patients. Covered Entities are also allowed to generate profits from the sale of 340B drugs to provide additional program income in order "to stretch scarce

Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384(II), at 12 (1992).

15.     To make it easier for patients of Covered Entities to receive 340B drugs, the U.S. Department of Health and Human Services' Health Resources Administration ("HRSA") permits Covered Entities to dispense 340B drugs to its eligible patients through their own pharmacies and/or through contracts with outside pharmacies; which act as purchasing/dispensing agents. As agents of FQHCs, Contract Pharmacies are also required to comply with all applicable federal, state, and local laws and meet the Covered Entity's grant, contract, and project requirements.  75 Fed. Reg. 10,272. (Mar. 5, 2010)

16.     For a fixed (per-prescription and/or percentage) "dispensing fee", a Contract Pharmacy orders and dispenses 340B drugs on behalf of the Covered Entity and provides drug inventory and formulary, patient dispensing records, third party billing and collection, record keeping, drug utilization reviews, auditable records, financial statements, patient profile and counseling services, and a tracking system to prevent the diversion of 340B drugs to individuals who are not eligible patients of the Covered Entity. 75 Fed. Reg. 10,272. (Mar. 5, 2010)

17.     Under the 340B program, a Covered Entity is permitted to use a "Ship-To-Bill-To" procedure, in which the Contract Pharmacy, on behalf of the Covered Entity, purchases the drugs directly from the manufacturers and wholesalers (with title to the 340B drugs passing to the Covered Entity) who ship the drugs directly to the contract pharmacy for dispensing to the Covered Entity's patients.

<u>**THE BORINQUEN PHARMACY/ BORINQUEN'S PHARMACY SERVICE
AGREEMENT ("PSA") WITH ICARE AND FINANCING AGREEMENT
WITH HEALTHCAP**</u>

18.     During February 2018, Borinquen obtained the necessary regulatory licensing and opened its own 340B pharmacy, "The Borinquen Pharmacy"; which was initially located in a strip mall on 1710 NW 7th Street, Suite 8-9, Miami, FL 33125 "Flagami Location".

19.     On July 21, 2018 Borinquen entered into a 5-year Pharmacy Services Agreement "PSA" with Defendant iCare to provide pharmacy services for its patients at the main site location as well as to train and educate Borinquen's personnel in the 340B program. (Pharmacy Services Agreement attached hereto and incorporated herein as "Exhibit A")

20.     In exchange for a dispensing fee equal to Eighteen and One-half Percent (18.50%) of gross program revenue; (or a minimum of Ten Dollars ($10.00) per prescription), iCare was contracted to perform; purchasing and dispensing 340B drugs to Borinquen's Eligible Patients, third party billing and collections, provide auditable records and financial statements on demand, maintain the drug inventory and formulary, do drug utilization review, provide patient profile and medication counseling services, as well as to provide tracking systems to prevent the diversion of 340B drugs to individuals who are not eligible patients of the Covered Entity and report controlled substances prescriptions.

21.     Under the PSA, iCare is also required to "educate and train" Borinquen's personnel on the administration and management of its pharmacy's

participation in the 340B Program and to file applications to obtain third party payor credentialing for the Borinquen Pharmacy.

22.     On July 21, 2018, Borinquen also entered into a 5-year inventory financing agreement with an iCare-related entity, Defendant Healthcap, for the latter to provide revolving capital, "on request", on an "as needed basis" and "from time to time", to finance the purchase of 340B drugs in return for a payment of 2% of the funds advanced for the Drugs purchased through iCare's Contract Pharmacy. (Covered Entity Financing Agreement; attached hereto and incorporated herein as "Exhibit B")

### FAILURE TO MOVE ICARE PHARMACY INTO THE BORINQUEN BUILDING AND ENTER INTO A LEASE

23.     Under the plain and clear language of the PSA, iCare was required to relocate its pharmacy from the Country Walk location into Borinquen's main site in Wynwood, enter into a fair market value lease for the pharmacy space, provide pharmacy services to the Plaintiff's Eligible Patients and 340B education and training to Borinquen's personnel.

24.     In flagrant violation of the agreement, iCare failed to relocate its pharmacy from Country Walk to Borinquen's main site, failed to enter into a lease for an iCare on-site pharmacy, failed to provide 340B education and training to Borinquen's personnel and instead, during November 2018, moved the Borinquen Pharmacy from its Flagami location into the Borinquen main site.

25.     iCare also assisted with the staffing of Borinquen Pharmacy; initially, through contractors from Borinquen's staffing agency, then through another staffing agency and eventually, iCare's started placing its employees at the Borinquen

Pharmacy. iCare also reduced the Borinquen Pharmacist In Charge's work hours, causing him to resign; all in a concerted scheme to take over the operation of the Borinquen Pharmacy and the Covered Entity's 340B program in general.

26.     After relocating the Borinquen Pharmacy from its Flagami location to the Wynwood main site, iCare falsely and continuously misrepresented to Borinquen that iCare's move from Country Walk into the Borinquen main site would soon follow and that having both pharmacies in one location would benefit Borinquen by centralizing the Covered Entity's pharmacy services under one roof at the main site.

27.     iCare for its own financial gain and in a willful, wanton, and reckless disregard for the rights of the Plaintiff, never moved its pharmacy from Country Walk nor established the iCare pharmacy as an in-house pharmacy at the Borinquen main site, never entered into a lease; and instead, remained clandestinely operating at its Country Walk location while at the same time, attempting to take control of the Borinquen Pharmacy and Borinquen's 340B program by selectively blocking Borinquen employee's access to the software program "Pioneer", transferring prescriptions from Borinquen's Pharmacy to the iCare pharmacy, entering into unauthorized and secret contracts on Borinquen's behalf, obstructing Borinquen's access to the 340B program's books and records and committed other nefarious acts herein complained of; including the filing of frivolous harassment complaints against Borinquen's Pharmacy Director.

28.     Defendant, iCare had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage to the Plaintiff would result

and, despite that knowledge, intentionally pursued that course of conduct, resulting in past and future losses or damages to the Plaintiff.

**ICARE'S UNAUTHORIZED DEBITS OF PERSONNEL EXPENSES**

29.     Under the PSA, Defendant iCare was obligated to **"…provide services at the on-site pharmacy and at the other Covered Entity clinic locations for up to 40 hours a week with sufficient pharmacists and technicians as needed."** These personnel expenses were supposed to be at iCare's cost while, "**Additional hours of non-emergency coverage at the request of the Covered Entity will be provided at cost to the Covered Entity."** PSA 8(f).

30.     Rather than staffing an iCare on-site pharmacy at the Borinquen main site for 40 hours a week with pharmacists and technicians as needed and charging Borinquen only for requested additional hours of non-emergency coverage, iCare not only failed to move its pharmacy into the main site but instead, began debiting substantial sums from Borinquen's 340B program income to pay for pharmacists, technicians and contractors.

**ICARE'S FAILURE TO CREDENTIAL BORINQUEN PHARMACY**

31.     Pursuant to the PSA, it was also agreed that while Borinquen would continue to own and operate its own 340B pharmacy, iCare would obtain payor credentialing for the Borinquen Pharmacy so that the latter could become eligible to receive reimbursements from the patients' insurance companies and other third-party payors.  (PSA 7 (n) and 40)

32.     iCare intentionally and willfully disregarded its obligations by not filing applications for credentialing with any of the Pharmacy Benefit Managers,

managed care plans nor with any of the private insurers for approximately 18 months; thereby intentionally delaying the credentialing of Borinquen Pharmacy while steering insured patient prescriptions to the iCare pharmacy and uninsured patients to the Borinquen Pharmacy.

33.     The failure of iCare to credential Borinquen Pharmacy with third-party payors was willful, wanton, or in reckless disregard for the rights of the Plaintiff, caused Plaintiff substantial delays in being able to properly operate its 340B pharmacy, become eligible to receive reimbursements from insurance companies for 340B prescriptions and has resulted in substantial financial losses to Plaintiff.

34.     Defendant, iCare had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage to the Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

**CONSPIRACY TO OBSTRUCT BORINQUEN FROM VERIFYING 340B PROGRAM INCOME AND COSTS**

35.     The Pharmacy Services Agreement of the parties requires that when payments and reimbursements are received by iCare from insurers, managed care plans and other third-party payors that iCare retain its dispensing fee and remit the balance of payments, credits, rebates reimbursement received from any source to the Covered Entity.

36.     While there is a requirement for iCare to provide a monthly report of collections and expenditures, there is no explicit authorization in the PSA for iCare to debit specific expenses (other than the legitimate financing charges and the dispensing fees) from the program income.

37.     The specific method for collecting revenue and payment of program income to Borinquen is found in PSA at paragraph 13:

> "Pharmacy or its designee shall make a monthly payment to Covered Entity in order to reconcile all collections and expenditures. When payments and reimbursements are received by the Pharmacy from third-party payors; …Pharmacy shall retain its fee for Pharmacy Services and remit the balance of payments, credits, rebates reimbursement received from any source to Covered Entity."

38.     Under section 7(c) of the PSA, iCare is also obligated to provide: "… pharmacy business records at Covered Entity's request so that Covered Entity may verify all contract debits and credits, including drug acquisition costs, distributor and manufacturer invoicing, dispensing fees and other contracted expenses, payments and credits, third-party reimbursements and payments and conduct a periodic comparison of Covered Entity's prescribing records with the dispensing records of Pharmacy to detect potential irregularities" The records must be maintained in a manner "…such that the records relating to Covered Entity are retrievable and separate from records pertaining to Pharmacy's own operations and made available to Covered Entity."

39.     Repeatedly, Borinquen has requested from iCare but has not received, 340B business records, particularly copies of contracts entered into with drug distributors and others on behalf of and as an agent of Borinquen, iCare's billing and income records related to Borinquen's 340B program; including those from pharmacy benefit managers (PBMs) used by iCare to bill the patients' insurance companies.

40.     Although iCare issues monthly financial reports to Borinquen, iCare has willfully refused to provide Borinquen with requested backup documents,

including copies of contracts and financial transactions with payors, Pharmacy Benefits Managers, distributors, wholesalers or other third parties in a calculated scheme to prevent Borinquen from verifying the acquisition costs and reimbursements of 340B drugs and verify Borinquen's gross program income received by iCare from Borinquen's patients, insurers, managed care plans and other third party payors as well as associated program costs.

41.     In order to enforce financial transparency and audit iCare's monthly financial reports to Borinquen, on April 3, 2020, Borinquen and iCare entered into a Fourth Amendment to the PSA in which joint bank accounts were opened for the purpose of depositing **all** payments and reimbursements received from insurers, third parties and patients; including any manufacturer rebates received under the 340B program. (Exhibit "A", Fourth Amendment)

42.     However, and notwithstanding its clear obligation to do so, iCare has willfully failed and refused to deposit into the joint iCare/Borinquen and Borinquen/iCare bank accounts all 340B gross program revenue; while at the same time blocking Plaintiff's access to the 340B Financial Business Records; claiming that these were not retrievable and separated from the records pertaining to its other clients.

43.     As a result of Defendant's failure to provide business records, Borinquen has been unlawfully deprived of its ability to accurately and independently verify its 340B gross and net program income to support its projects, improve health care for the medically underserved, the uninsured and other low-

income individuals and families and to fully meet its obligations to prevent diversion under this federal healthcare program.

44.     In spite of the fact that iCare is supposed to collect a dispensing fee equal to 18.5% of gross program revenue (or a minimum of $10.00 per prescription), according to iCare's monthly report, out of the $1,141,886.33 gross program revenue allegedly collected for the month of January 2021, iCare has received dispensing fees of $233,576.32, financing fees of $17,874.05 and Direct and Indirect Renumeration (DIR) fees of $53,028.90 while Borinquen's net program income was only $159,688.24; with the rest of the funds allegedly going to expenses.

## INTERFERENCE WITH WALGREENS AND CVS/WELLPARTNER PSAS

45.     Although Borinquen entered into a 340B PSA with iCare, Borinquen as a Covered Entity, retains the right to provide pharmacy services to its Eligible Patients through its own pharmacy and/or by contracting with other pharmacies at multiple locations.

46.     "Each Covered Entity has the option of individually contracting for pharmacy services with a pharmacy(ies) of its choice. Covered entities are not limited to providing comprehensive pharmacy services to any particular location and may choose to provide them at multiple locations and/or in-house." Federal Register/ Vol. 75, No. 43 C. (3)(b).

47.     At the time that the iCare PSA was signed, Borinquen also had PSAs with several other contract pharmacies, including Publix and Walgreens; the latter of which had not gone live through the integration of the applicable information technology between Walgreens and Borinquen.

48.     Being that more than half of Borinquen patients freely choose to fill their prescriptions at Walgreens' and CVS' multiple store locations, Borinquen became interested in pursuing additional 340B program revenue by activating its existing 340B PSA with Walgreens and adding CVS as an additional 340B contract pharmacy.

49.     Accordingly, during May 2019, Borinquen entered into active discussions with Walgreens to renegotiate the existing PSA and to complete the information technology integration process.

50.     During this time, negotiations with CVS also commenced to add CVS as an additional contract pharmacy for Borinquen's 340B program.

51.     Both Walgreens and CVS expressed a strong interest in contracting with Borinquen and provided PSAs and financial projections involving substantial 340B program income to the Covered Entity; based on the number of Borinquen patients already using these pharmacies and the prescriptions they generated.

52.     On May 8, 2019, one of the principals of iCare and Healthcap, who was volunteering at Borinquen as the pharmacy director, sent an email to CVS and Walgreens introducing himself and requesting to be included in all communications regarding establishing, activation and operating a 340b relationship with Borinquen.

53.     On June 7, 2019 Walgreens, CVS and its third-party Administrator, Wellpartner, LLC received "cease and desist" letters from iCare and Healthcap; claiming that iCare had the exclusive right to negotiate 340B PSAs on behalf of Borinquen, that Borinquen was required to obtain Healthcap's written consent or "ratification" prior to entering into a PSA with another pharmacy and threatening

14

legal action if Walgreens and CVS/Wellpartner continued their negotiations with Borinquen.

54.     Notably, nowhere in the PSA does it state that Borinquen has appointed iCare as its exclusive agent for the purpose of negotiating 340B PSAs with other pharmacies nor, as stated in the cease-and-desist letters, that Borinquen "must obtain iCare's prior written consent to enter into a contract pharmacy services agreement with any other entity".

55.     The cease-and-desist letters' assertion that "Healthcap's written consent is required to ratify" any PSA between Borinquen and Walgreens and CVS Pharmacy and/or an Administrative Services Agreement with Wellpartner, LLC, is also false and not mentioned anywhere in the Borinquen/Healthcap Financing Agreement.

56.     In order to avoid litigation over the cease-and-desist letters and try to enter into 340B PSAs with these major pharmacies, Borinquen provided a limited grant of authority for said principal to negotiate with Walgreens and CVS/Wellpartner.

57.     For unknown reasons, negotiations never went forward on pharmacy services agreements with Walgreens and CVS/Wellpartner; while at the same time, iCare and Healthcap refusing to withdraw their cease-and-desist letters despite demands to do so.

58.     The actions of iCare and Healthcap, by and through their agents, of interfering with Borinquen's PSAs with Walgreens and prospective advantageous

business relationship with CVS/Wellpartner were intentional and willful, without right or justification and resulted in actual damages to Plaintiff.

59.     As a result of iCare's interference with Borinquen's prospective business relationships, Walgreens and CVS/Wellpartner ceased their discussions with Borinquen and have not entered into nor activated Pharmacy Services Agreements with said Covered Entity; thereby depriving Plaintiff Borinquen of several hundred thousand dollars of 340B program income and causing Borinquen significant financial losses.

60.     Defendants, iCare and Healthcap had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in past and future losses and damages to the Plaintiff.

## PATIENT INCENTIVES

61.     During January 2019, iCare initiated a "Patient Incentive" Program in which gift cards were provided to certain patients as a way to attract and retain them as pharmacy clients.

62.     This program was initiated by iCare without any disclosure regarding its propriety, nor that it intended to utilize Borinquen's 340B program income to fund the costs of this medication adherence program.

63.     Prior to the incentive program being terminated by Borinquen, iCare inappropriately debited substantial sums from Borinquen's 340B program income in order to maintain and pay for said patient incentive program; thereby depriving

Plaintiff of approximately $150,000.00 of program income and causing Borinquen significant, further financial losses.

64.     Defendant, iCare has refused to reimburse the Plaintiff for these charges, had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in past and future losses and damages to the Plaintiff.

65.     The above-described conduct by Defendant, iCare was willful, wanton, intentional, without right or justification and in reckless disregard for the rights of the Plaintiff.

<strong><u>DIRECT AND INDIRECT RENUMERATION FEES</u></strong>

66.     The Centers for Medicare and Medicaid Services (CMS) has created Direct and Indirect Renumeration (DIR) fees as a way to track the annual amount of drug manufacturer rebates and other price adjustments applied to prescription drug plans impacting the total cost of Medicare Part D medications.

67.     DIR fees, also include a fee charged to a pharmacy for meeting or failing to meet certain patient quality measures.

68.     The DIR quality measures are pharmacy specific scores, based on retail medication therapy management and chronic disease management for patients with diabetes, high blood pressure, and other chronic conditions and create lower scores and financial penalties for specialty pharmacies that do not fill for or manage those chronic diseases.

69.     One year after the Borinquen/iCare PSA was signed and commencing on August 2019, iCare inexplicably started debiting substantial sums from Plaintiff's 340B program income; allegedly resulting from unverified DIR fees related to unspecified pharmacy operations. To date, these DIR charges debited from Borinquen's 340B program income total approximately $232,000.00.

70.     In spite of numerous requests from Plaintiff Borinquen, Defendant iCare in a willful, wanton, and reckless disregard for the rights of the Plaintiff, has refused to document, justify or correct the debited 340B program funds to which it knows or should know it is not entitled, nor has iCare provided the back-up documentation as to the origin, authority and reason for debiting substantial funds from Plaintiff's 340B program income.

## PRESCRIPTION POACHING

71.     As a fiduciary and under the PSA, iCare has agreed to render Pharmacy Services to Borinquen in a "timely, professional, competent and ethical manner". PSA 19 (a)

72.     During the holidays, between December 28, 2020 to January 5, 2021, (including on Sundays) while working clandestinely from its Country Walk location, iCare electronically misappropriated and transferred over 1,000 Borinquen patient prescriptions for legend drugs and controlled substances from the Borinquen Pharmacy to the iCare Pharmacy.

73.     This unauthorized prescription transfer occurred in violation of a patient's right to choose a pharmacy provider; without the knowledge or request of the Borinquen Pharmacy; in the absence of any prescription transfer request; was not

in the best interests of the Covered Entity, was done surreptitiously and in material

breach of the PSA 40 which states:

> "… that during the term of this agreement and for a period of two (2) years after termination thereof, (whether same is by expiration and/or with or without cause), Pharmacy will not solicit or attempt to solicit (either directly or by assisting others) any business from Covered Entity's patients, for the purpose of providing services that are competitive with the type of services provided by Covered Entity. This restriction shall apply only to patients with whom, to the best of Pharmacy's knowledge, Covered Entity or its providers have a provider/patient relationship or which are actively being sought by Covered Entity. It is further understood and agreed by both the Covered Entity and the Pharmacy that a patient's freedom to choose his or her own provider of pharmacy services shall in no way be limited."

74.     The Borinquen Pharmacy's inability to dispense these prescriptions to

its patients as a result of this unlawful prescription pilfering and patient solicitation

by iCare has created severe health risks and a threat to the safety of Borinquen's

patients, confusion in prescription dispensing, significant service failures, as well as

patient complaints and financial losses to Borinquen.

75.     Said wrongful acts by Defendant iCare were willful, wanton, and in

reckless disregard for the rights of the Plaintiff, including Borinquen's right to operate

its own pharmacy so that "… together with Covered Entity's pharmacy (Borinquen

Pharmacy) shall have sole and exclusive rights and authority to provide the

Pharmacy Services described herein to Covered Entity". (PSA 40)

76.     Defendant, iCare had actual knowledge of the wrongfulness of the

conduct and the high probability that injury or damage to the Plaintiff would result

and, despite that knowledge, intentionally pursued that course of conduct, resulting

in past and future losses and damages to the Plaintiff.

## UNAUTHORIZED FINANCING CHARGES

77.    As above stated, Plaintiff Borinquen signed a 5-year inventory financing agreement with Defendant Healthcap, an iCare related entity, requiring the latter to provide, (in return for a one-time 2% fee) revolving capital, "on request", and "on an as needed basis", "from time to time", to finance the purchase 340B drugs. The intention of the parties was to use the financing to start the pharmacy operations until sufficient operating capital could be generated. (Exhibit "B")

78.    Defendants iCare and Healthcap have been fraudulently applying multiple, unauthorized and continuing financing charges on 340B drug purchases and have thereby misappropriated additional program income intended to serve Borinquen's medically underserved and indigent patients.

79.    Defendants iCare and Healthcap in spite of the limitation of the financing charges to 340B drugs have also been skimming from Plaintiff's 340B program income a 2% (or more) interest charge for all non-drug expenses, including for payroll and other expenses.

80.    In spite of continuing requests from Borinquen to iCare and Healthcap to stop these unrequested and illegal charges, iCare and Healthcap in a willful, wanton, malicious or reckless disregard for the rights of the Plaintiff, continue to pilfer substantial funds from this Federal Health Care program under the guise of contractual 340B drug inventory financing fees.

81.    Defendants, iCare and Healthcap have actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the

20

Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct; resulting in past and future losses and damages to Plaintiff.

## PATIENT ELIGIBILITY

82.     As defined at 61 Fed. Reg. 55156 (Oct. 24, 1996), and described in Section 1(b) of the PSA an: "Eligible Patient is described as follows: …only if the individual meets the prescribed patient definition criteria as set forth including meeting the following conditions:

(i)     Covered Entity has established a relationship with the individual, such that Covered Entity maintains records of the individual's health care;

(ii)    The individual receives health care services from a health care provider who is either employed by the Covered Entity or provides health care under contractual or other arrangements (e.g. referral for consultation) with Covered Entity such that the responsibility for the care provided remains with the Covered Entity; and

(iii)   The individual receives a healthcare service or range of services from the Covered Entity which is consistent with the service or range of services for which grant funding or federally qualified health center look-alike status has been provided to the Covered Entity

Furthermore, "an individual will not be considered an Eligible Patient if the only healthcare service provided by Covered Entity to the individual is the dispensing of a drug or drugs for subsequent self-administration or administration in home setting."

83.     Plaintiff has provided Defendant iCare with its current roster of eligible patients and providers by providing Defendant iCare with access to its software program, Athena; which includes the patients' electronic health records.

84.     Under the PSA 3(b), iCare is supposed to establish and maintain a pharmacy tracking system suitable to prevent the dispensing of 340B drugs to individuals who are not Eligible Patients.

85.     Notwithstanding, its obligation to verify and track patient eligibility for 340B drugs, Defendant iCare, by and through its employees and contractors, and upon information and belief, may be dispensing 340B drugs to persons that may not be eligible patients of the Covered Entity.

**FEES AND COSTS**

86.     Both the iCare Pharmacy Services Agreement and the Healthcap Financing Agreement contain attorney's fees and costs provisions.

**COUNT I – BREACH OF FIDUCIARY DUTY AGAINST
ICARE AND HEALTHCAP**

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

87.     Defendant iCare by acting as a purchasing and dispensing agent for Plaintiff's 340B drugs, as well as by undertaking the Plaintiff's insurance billing and receiving, handling, controlling and accounting for Plaintiff's 340B program revenue and other undertakings as above-mentioned, has entered into a fiduciary relationship of trust and confidence with the Plaintiff in which Plaintiff reposed confidence in Defendant and in which said confidence was acquired and accepted by Defendant, iCare.

88.     Defendant Healthcap, by acting as a financing agent of Plaintiff's 340B drugs, as well as by undertaking the handling, controlling and accounting for Plaintiff's 340B revenue and other undertakings as above-mentioned, has also entered into a fiduciary relationship of trust and confidence with the Plaintiff in which Plaintiff reposed confidence in Defendant and in which said confidence was acquired and accepted by Defendant, Healthcap.

89.     Defendants iCare and Healthcap owe Borinquen the duty to act with the highest degree of honesty and loyalty and in the best interests of the Plaintiff, including the duty to properly handle and account for the collection of 340B program revenue, the duty to make the appropriate payment of 340B program income to Plaintiff, the duty to disclose relevant facts and render accounts to Plaintiff, the duty to maintain and provide access to its books and records, as well as the duty to not poach patients and prescriptions, not interfere with Plaintiff's actual and prospective business relationships, not enter into secret agreements affecting Plaintiff's 340B program nor receive a secret profit on transactions within the scope of the fiduciary relationship.

90.     Defendants' acts and omissions as above stated, have breached Defendants' fiduciary duty to Plaintiff, caused damages and losses to Plaintiff, constitute a breach of Defendants' fiduciary duty of loyalty to Plaintiff, their duty of care to carry out their responsibilities in an informed and considered manner and their duty to act as an ordinarily prudent person would act in the management of his or her own affairs.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., demands judgment against the Defendants, iCare Rx LLC and Healthcap Solutions, LLC for compensatory, exemplary and punitive damages, and a reasonable attorney's fees, interest and costs.

## COUNT II
## NEGLIGENCE AGAINST DEFENDANT ICARE

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

91.     Defendant iCare, by and through its agents, servants and employees owed the Plaintiff the duty to:

    a.  move its pharmacy operations and provide an in-house pharmacy at Borinquen's main site, including the payment of rent;

    b.  exercise reasonable care in the collection and handling of the Plaintiff's 340B pharmacy program income; including not deducting unauthorized expenses or generating secret profits from the Plaintiff's funds.

    c.  accurately report and disclose to Plaintiff the collection of third-party reimbursements from insurers, government programs and patients and credits for each 340B drug dispensed;

    d.  account for and pay net 340B program income to Plaintiff;

    e.  provide pharmacy services in a timely, professional, competent and ethical manner;

    f.  educate and train Plaintiff's personnel on the administration and management of a 340B pharmacy to dispense to its own patients and to also obtain payor credentialing for the Borinquen Pharmacy;

    g.  maintain and provide Plaintiff, upon request, with access to business records, including 340B contracts with drug distributors, in order for Plaintiff to establish or verify program income, costs, charges, reimbursement rates, billing, payments or receipts;

    h.  not interfere with Plaintiff's actual and prospective advantageous business relations;

    i.  not poach patients and prescriptions, enter into secret agreements affecting the Covered Entity's 340B program, nor receive a secret profit on transactions within the scope of the relationship of the parties.

    j.  Properly implement a tracking system to prevent the dispensing of 340B inventory drugs to individuals who are not eligible patients;

    k.  adopt and utilize the appropriate policies, procedures, methodology and personnel to ensure the exercise of due care and diligence when acting on behalf of and as an agent for Plaintiff in connection with the Plaintiff's 340B program;

l. comply with the applicable federal and state laws, rules and regulations, as well as the 340B program standards, guidance and requirements of the U.S. Department of Health and Human Services' Health Resources and Services Administration;

m. take adequate precautionary or preventive measures to protect the Plaintiff from the reasonably foreseeable risk of harm that the Defendants knew or should have known about;

n. prevent other reasonably foreseeable negligent or wrongful acts, errors, omissions misleading or wrongful statements while carrying out its professional services and duties to the Plaintiff.

92.     Defendant iCare, by and through its agents, servants and employees breached its duty of care to the Plaintiff to exercise reasonable care and was negligent by committing one or more of the following negligent acts or omissions:

a. Failing to move its pharmacy operations and provide an in-house pharmacy at Borinquen's main site, including the payment of rent;

b. Failing to exercise reasonable care in the collection and handling of the Plaintiff's 340B pharmacy program income; including deducting unauthorized expenses and generating secret profits from the Plaintiff's funds.

c. Failing to accurately report and disclose to Plaintiff the collection of third-party reimbursements from insurers, government programs and patients and credits for each 340B drug dispensed;

d. Failing to account for and pay net 340B program income to Plaintiff;

e. Failing to provide pharmacy services in a timely, professional, competent and ethical manner;

f. Failing to educate and train Plaintiff's personnel on the administration and management of a 340B pharmacy to dispense to its own patients and to also obtain payor credentialing for the Borinquen Pharmacy;

g. Failing to maintain and provide Plaintiff, upon request, with access to business records, including 340B contracts with drug distributors, in order for Plaintiff to establish or verify program

income, costs, charges, reimbursement rates, billing, payments or receipts;

h. Tortiously interfering with Plaintiff's actual and prospective advantageous business relations;

i. Poaching patients and prescriptions, entering into secret agreements affecting the Covered Entity's 340B program, and receiving a secret profit on transactions within the scope of the relationship of the parties;

j. Failing to properly implement a tracking system to prevent the dispensing of 340B inventory drugs to individuals who are not eligible patients;

k. Failing to adopt and utilize the appropriate policies, procedures, methodology and personnel to ensure the exercise of due care and diligence when acting on behalf of and as an agent for Plaintiff in connection with the Plaintiff's 340B program;

l. Failing to comply with the applicable federal and state laws, rules and regulations, as well as the 340B program standards, guidance and requirements of the U.S. Department of Health and Human Services' Health Resources and Services Administration;

m. Failing to take adequate precautionary or preventive measures to protect the Plaintiff from the reasonably foreseeable risk of harm that the Defendants knew or should have known about;

n. Failing to prevent other reasonably foreseeable negligent or wrongful acts, errors, omissions misleading or wrongful statements while carrying out its professional services and duties to the Plaintiff.

93.    Defendant, iCare's acts and omissions as above stated, have caused past and future losses and damages to Plaintiff.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., demands judgment against the Defendant, iCare Rx LLC for compensatory, exemplary and punitive damages, and a reasonable attorney's fees, interest and costs.

## COUNT III
## NEGLIGENCE AGAINST DEFENDANT HEALTHCAP

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

94.    Defendant Healthcap, by and through its agents, servants and employees owed the Plaintiff the duty to:

      a.  not charge unauthorized and illegal financing fees and expenses from the Plaintiff's 340B program funds;

      b.  maintain and provide Plaintiff, upon request, with access to business records;

      c.  not interfere with Plaintiff's actual and prospective advantageous business relations;

      d.  take adequate precautionary or preventive measures to protect the Plaintiff from the reasonably foreseeable risk of harm that the Defendants knew or should have known about;

      e.  prevent other reasonably foreseeable negligent or wrongful acts, errors, omissions misleading or wrongful statements while carrying out its professional services and duties to the Plaintiff.

95.    Defendant Healthcap, by and through its agents, servants and employees breached its duty of care to the Plaintiff to exercise reasonable care and was negligent by committing one or more of the following negligent acts or omissions:

      a. charging unauthorized and illegal financing fees and expenses from the Plaintiff's 340B program funds;

      b. Not providing Plaintiff, upon request, with access to business records;

      c. Interfere with Plaintiff's prospective advantageous business relations;

d. Failing to take adequate precautionary or preventive measures to protect the Plaintiff from the reasonably foreseeable risk of harm that the Defendants knew or should have known about;

e. Failing to prevent other reasonably foreseeable negligent or wrongful acts, errors, omissions misleading or wrongful statements while carrying out its professional services and duties to the Plaintiff.

96.    Defendant, Healthcap's acts and omissions as above stated, have caused past and future losses and damages to Plaintiff.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., demands judgment against the Defendant, Healthcap Solutions, LLC for compensatory, exemplary and punitive damages and a reasonable attorney's fees, interest and costs.

## COUNT IV
## BREACH OF CONTRACT AGAINST ICARE

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

97.    Defendant iCare, by and through its agents, servants and employees breached the Pharmacy Services Agreement by:

a. Failing to move its pharmacy operations and provide an in-house pharmacy at Borinquen's main site, including the failure to enter into a fair market lease for the payment of rent;

b. Failing to exercise good faith and reasonable care in the collection and handling of the Plaintiff's 340B pharmacy program income; including by deducting unauthorized expenses from the Plaintiff's funds.

c. Not accurately reporting and disclosing to Plaintiff the collection of third-party reimbursements from insurers and patients and all credits received;

d. Failing to account for and make proper payment of net 340B program income to Plaintiff;

e.  Not providing pharmacy services in a timely, professional, competent and ethical manner;

f.  Not educating and training Plaintiff's personnel on the administration and management of a 340B pharmacy to dispense to its own patients and obtain payor credentialing for the Borinquen Pharmacy;

g.  Not providing Plaintiff, upon request, with access to business records, including 340B contracts with drug distributors, in order for Plaintiff to establish and independently verify program income, costs, charges, reimbursements and third-party payments;

h.  Interfering with Plaintiff's actual and prospective advantageous business relations;

i.  Poaching patients and prescriptions, entering into secret agreements affecting the Covered Entity's 340B program, and receiving a secret profit on transactions within the scope of the relationship of the parties;

j.  Upon information and belief, failing to effectively implement a tracking system to prevent the dispensing of 340B inventory drugs to individuals who are not eligible patients;

k.  Not adopting and utilizing the appropriate policies, procedures, methodology and personnel to ensure the exercise of due care and diligence when acting on behalf of and as an agent for Plaintiff in connection with the Plaintiff's 340B program;

l.  Failing to comply with the applicable federal and state laws, rules and regulations, as well as the 340B program standards, guidance and requirements of the U.S. Department of Health and Human Services' Health Resources and Services Administration;

m.  Not taking adequate measures to act lawfully in order to protect the Plaintiff from the reasonably foreseeable risk of harm that the Defendants knew or should have known might result to Plaintiff from Defendant's failure to comply with the applicable federal and state laws, rules and regulations, the 340B program standards, guidance and requirements of the U.S. Department of Health and Human Services' Health Resources and Services Administration;

n.  Other material breaches by Defendant of their duty of care which proximately caused damages to Plaintiff.

98.     Defendant, iCare's acts and omissions as above stated, have caused past and future damages and losses to Plaintiff.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., demands judgment against the Defendant, iCare Rx LLC for compensatory damages flowing from the breach of the contract, exemplary and punitive damages and a reasonable attorney's fees, interest and costs.

## COUNT V
## BREACH OF CONTRACT AGAINST HEALTHCAP

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

99.     As above stated, Plaintiff Borinquen signed a 5-year inventory financing agreement with Defendant Healthcap, for the latter to provide revolving capital, "on request", and "on an as needed basis", "from time to time" to finance the purchase 340B drugs for its inventory of outpatients' drugs purchased by Covered Entity through the iCare Contract Pharmacy.

100.    Under the agreement, the Covered Entity (Borinquen) agreed to pay Healthcap an amount equal to two percent (2.0%) of the funds advanced for the cost of the Drugs purchased by Covered Entity through Contract Pharmacy payable in full (together with the underlying Advances to which such Fees relate) on or before the 30th day after the date of the Advance.

101.    Defendant Healthcap, by and through its agents, servants and employees breached the Covered Entity's Financing Agreement by:

   a.  Charging unauthorized, continuing and multiple financing fees for the same advance;

b. Charging 2% or more interest on non-drug expenses, including personnel costs;

c. Charging 2% or more interest on drug and non-drug expenses, including personnel costs for Borinquen Pharmacy;

d. Not providing Plaintiff, upon request, with access to business records;

e. Interfering with Plaintiff's prospective advantageous business relations;

f. Other material breaches by Defendant of the Covered Entity Financing Agreement proximately causing injuries and damages to Plaintiff.

102.    Defendant, Healthcap's acts and omissions as above stated, have caused past and future losses and damages to Plaintiff.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., demands judgment against the Defendant, Healthcap Solutions, LLC for compensatory damages flowing from the breach of the contract, exemplary and punitive damages and a reasonable attorney's fees, interest and costs.

## COUNT VI
## EQUITABLE ACCOUNTING

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

103.    Plaintiff seeks an equitable accounting, regarding Defendant's 340B drug sales and expenses in order to be able to accurately calculate Plaintiff's gross program income, legitimate and illegitimate charges and expenses, including the cost of goods, dispensing fee and resulting compensation that Defendants owe to Plaintiff.

104.     Plaintiff is entitled to an equitable accounting due to the existence of a fiduciary relationship, the complex transactions involved as a result of the Pharmacy Services Agreement and the Financing Agreement, and the fact that the remedy at law is inadequate.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., demands judgment against the Defendants, iCare Rx LLC and Healthcap Solutions, LLC for an equitable accounting and a reasonable attorney's fees, interest and costs.

## COUNT VII
## DECLARATORY RELIEF

Plaintiff realleges the foregoing paragraphs as if fully pled herein and would further state:

105.     This is an action for declaratory judgment pursuant 28 U.S.C. § 2201(a).

106.     Plaintiff is uncertain with respect to its rights, status and legal relations with Defendants and as such, requests declaratory relief.

107.     There is a bona-fide, actual, present practical need for a declaration.

108.     The declaration of the rights and other legal relations of the parties to this action concerns a present, ascertained, or ascertainable set of facts and a present bona fide controversy.

109.     Accordingly, Plaintiff request that this Honorable Court declare the rights and other legal relations of the parties and determine all sums due from the Defendants.

WHEREFORE, the Plaintiff, Borinquen Health Care Center, Inc., respectfully requests declaratory and other relief against the Defendants, iCare Rx LLC and Healthcap Solutions, LLC, including for determination of compensatory, exemplary and punitive damages, and a reasonable attorney's fees, interest and costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable of right by a jury.

Dated this 4th day of March 2021.

**JORGE A. DUARTE, P.A.**
Attorney for Plaintiff
9990 SW 77 AVE
PH 12
Miami, FL 33156
Phone: (305) 358-2400
Fax: (305) 667-9739
jorge@duartelegal.com
karen@duartelegal.com

BY:
JORGE A. DUARTE
FBN 229016

33

# EXHIBIT

## "A"

## 340B CONTRACT PHARMACY SERVICES AGREEMENT

THIS 340B CONTRACT PHARMACY SERVICES AGREEMENT (this "Agreement") is made as of July ꞍꞍ___, 2018 ("Effective Date") by and between Borinquen Health Care Center, Inc. ("BHCC" or "Borinquen"), an entity eligible under the Section 340B Drug Pricing Program as described below (hereinafter "Covered Entity"), and ICARE RX LLC (hereinafter "Pharmacy").

WHEREAS, Covered Entity is a federally qualified health care center and a "covered entity" as defined in Section 340B of the Public Health Service Act, 42 U.S.C. § 256b (hereinafter the "340B Program") and is eligible to purchase certain outpatient drugs at reduced prices for use by certain patients of the Covered Entity in accordance with the specifications established by the 340B Program ("Eligible Patients") from drug manufacturers who have signed a pharmaceutical pricing agreement with the United States Department of Health and Human Services ("DHHS") and/or the manufacturers' wholesalers;

WHEREAS, the 340B Program authorizes BHCC, as a covered entity, to contract with licensed pharmacies to dispense certain outpatient drugs to Eligible Patients of the Covered Entity, providing that the requirements of the 340B Program are met,

WHEREAS, Covered Entity provides health care services to Eligible Patients at its various clinic locations;

WHEREAS, Pharmacy is duly licensed as a pharmacy in the State of Florida;

WHEREAS, Pharmacy has unique expertise in developing and operating pharmacies and maximizing the benefits of the 340B Drug Purchasing Program;

WHEREAS, under the terms and conditions of this Agreement, Pharmacy will open and operate an in-house pharmacy at BHCC's main location at 3601 Federal Highway, Suite 125, Miami, FL 33137, and will also provide Pharmacy Services to Eligible Patients of Covered Entity at each of the sites of the Covered Entity as may be listed on DHHS's Office of Pharmacy Affairs database and website;

WHEREAS, under the terms and conditions of this Agreement, Covered Entity desires to engage Pharmacy to provide Pharmacy Services (as defined in Section 7 of this Agreement), to Eligible Patients with respect to outpatient drugs purchased pursuant to the 340B Program, and Pharmacy desires to be so engaged.

NOW, THEREFORE, in consideration of the above recitals which are hereby incorporated as part of this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

PCV

CW

MSS

1. **Eligible Drugs and Eligible Patients.**

(a)    The prescription outpatient drugs, biological products and insulin covered under this Agreement include those products that are eligible for 340B drug pricing under the 340B Program and dispensed by Pharmacy to an Eligible Patient ("Eligible Drugs"). The parties will mutually agree on a formulary for drugs that may qualify as Eligible Drugs under this Agreement.

(b)    Covered Entity will identify Eligible Patients under this Agreement. Covered Entity will consider a patient as an "Eligible Patient" under this Agreement only if the individual meets the prescribed patient definition criteria as set forth at 61 Fed. Reg. 55156 (Oct. 24, 1996), as may be amended or replaced from time to time by the federal Health Resources & Services Administration ("HRSA"), including meeting the following conditions:

(i)    Covered Entity has established a relationship with the individual, such that Covered Entity maintains records of the individual's health care;

(ii)    The individual receives health care services from a health care professional who is either employed by Covered Entity or provides health care under contractual or other arrangements (e.g., referral for consultation) with Covered Entity such that the responsibility for the care provided remains with Covered Entity; and

(iii)    The individual receives a health care service or range of services from the Covered Entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status has been provided to the Covered Entity.

An individual will not be considered an Eligible Patient if the only health care service provided by Covered Entity to the individual is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.

2. **Purchase and Shipment of Drugs.**

(a)    Covered Entity hereby appoints Pharmacy to act as Covered Entity's duly authorized agent for the purpose of negotiating contracts with 340B participating drug manufacturers, wholesalers, or distributors for the purchase of Eligible Drugs for Covered Entity's Eligible Patients at applicable 340B pricing. Pharmacy shall maintain sufficient supplies of Eligible Drugs, to meet the day-to-day needs of Eligible Patients. The parties will use a "ship to, bill to" procedure in which the Covered Entity purchases the Eligible Drugs, but Eligible Drugs are shipped directly to Pharmacy. The Covered Entity maintains title to the Eligible Drugs and arranges to be billed directly for such drugs. The Pharmacy will compare all shipments received to the orders and inform the Covered Entity of any discrepancy within thirty (30) business days of receipt. Pharmacy, on behalf of the Covered Entity will make timely payments for such drugs delivered to the Pharmacy.

PCV

2
CW

MSS

(b)     Pharmacy has the right, in its reasonable discretion and when in the best interest of the Covered Entity, to provide Eligible Drugs to Eligible Patients under this Agreement by utilizing one or more Affiliated Pharmacy (as defined below) to fill prescriptions. Pharmacy may assign part of its 340B dispensing responsibilities under this Agreement to any Affiliated Pharmacy after reasonable notice of the assignment and reasons therefore to Covered Entity. Covered Entity shall thereafter take commercially reasonable steps to add Affiliated Pharmacies to the DHHS's Office of Pharmacy Affairs database and website. For purposes of this Agreement, an "Affiliated Pharmacy" is any pharmacy that is qualified to dispense drugs under the 340B Program, has all required federal and state licenses, and that either: (i) directly or through one or more intermediaries, controls, is controlled by, or is under common control with, the Pharmacy or (ii) managed by the Pharmacy or an Affiliated Pharmacy through a management agreement, pharmacy services agreement, or similar arrangement. The "Borinquen Pharmacy" currently owned and operated by Covered Entity for the purposes of this agreement, is included in the definition of "Affiliated Pharmacy".

3.  **Pharmacy System.**

    (a)     The parties understand and acknowledge that, under the 340B Program, if a drug that would otherwise be an Eligible Drug is sold or otherwise transferred to a person who is not an Eligible Patient, then Covered Entity may be liable to the manufacturer in an amount equal to the reduction in the price of the Eligible Drug under the 340B Program.

    (b)     Pharmacy shall establish and maintain a pharmacy tracking system suitable to prevent the diversion or dispensing of Eligible Drugs to individuals who are not Eligible Patients. Prior to Pharmacy providing Pharmacy Services pursuant to this Agreement, Covered Entity shall have the opportunity, upon reasonable notice and during business hours, to examine the pharmacy system. Pharmacy shall permit Covered Entity or its duly authorized representatives to have reasonable access to Pharmacy's facilities and records at mutually convenient times during the term of this Agreement in order to make periodic checks regarding the efficacy of such pharmacy system. Pharmacy agrees to make any and all adjustments to the patient processes which Covered Entity advises are reasonably necessary to prevent dispensing of Eligible Drugs to individuals who are not Eligible Patients. Both parties acknowledge and agree that they will not sell, resell, or transfer an Eligible Drug to an individual who is not an Eligible Patient.

    (c)     Covered Entity shall submit a Pharmacy provided enrollment referral form for every Eligible Patient to pharmacy indicating the Eligible Patient status, the appropriate prescriber name and information, patient demographics, patient prescription drug insurance information and the delivery location for the specific medication(s).

4.  **Reports and Recordkeeping.**

    (a)     No later than the twenty-fifth (25th) business day of each month, Pharmacy will provide Covered Entity with a dispensing report which lists all prescriptions filled for Eligible Patients under this Agreement for the previous month, including the Eligible Patient, date of birth of each Eligible Patient, the drug name, strength, quantity of the drug dispensed, and the National Drug Code (NDC) number. The report shall also include the gross reimbursement due and paid,

PCV

CW

MSS

the actual drug cost and dispensing fee owed to Pharmacy. In addition, both parties agree to participate in a quarterly meeting to review the Covered Entity's 340B program, resolve any related issues, and develop action items.

(b)     Pharmacy and Covered Entity will maintain records sufficient to demonstrate compliance with 340B Program rules and requirements, including the prohibitions against diversion and duplicate discounts, for a period of time that complies with all applicable federal, state, and local requirements, but at least five (5) years. Covered Entity and Pharmacy will identify the necessary information for the Covered Entity to meet its ongoing responsibility to comply with 340B Program requirements.

(c)     Pharmacy shall maintain the records described in this section such that the records relating to Covered Entity are retrievable and separate from records pertaining to Pharmacy's own operations and made available to Covered Entity, HRSA, HHS Inspector General, the FDA, CMS, and any other governmental agency with jurisdiction, and/or a drug manufacturer and as otherwise permitted by law and this Agreement in the event of an audit.

**5.  Relationship of the Parties.**

None of the provisions of this Agreement are intended to create, nor shall they be deemed or construed to create, any relationship between the parties other than that of independent entities contracting solely for the purpose of this Agreement. Neither of the parties shall be construed to be the partner, co-venturer, or employee or representative of the other party.

Each party shall be responsible for the payment of their respective taxes, fees and/or similar assessments, including any related penalties and interest which is due or may become due in connection the any amounts payable under this Agreement.

**6.  Pharmacy Site(s).**

Pharmacy agrees it will provide Pharmacy Services contracted for under this Agreement, through its employees and/or contractors at 3601 Federal Highway, Suite 125, Miami, FL 33137 ("Pharmacy Location"), and concurrently with the execution of this Agreement, Pharmacy and Covered Entity will enter into a lease, at fair market value for the lease of sufficient space within such Pharmacy Location for Pharmacy to conduct the Pharmacy Services to be provided under this Agreement. In addition, Pharmacy will also serve Eligible Patients of Covered Entity at each of the sites of the Covered Entity clinic sites and parent-child sites as may be listed on DHHS's Office of Pharmacy Affairs database and website.

**7.  Pharmacy Services.**

Pharmacy shall provide "Pharmacy Services," which shall include:

(a)     purchasing of 340B drugs on behalf of Covered Entity, dispensing of product, recordkeeping, drug utilization review, patient consultation and counseling in an appropriate setting and other standard and specialty clinical pharmacy service in accordance with applicable state and Federal law;

PCV

CW

MSS

(b)     providing reports to the Covered Entity that shall include dispensing information for Covered Entity determination of Eligible Drugs;

(c)     providing pharmacy business records at Covered Entity's request so that Covered Entity may verify all contract debits and credits, including drug acquisition costs, distributor and manufacturer invoicing, dispensing fees and other contracted expenses, payments and credits, third-party reimbursements and payments and conduct a periodic comparison of Covered Entity's prescribing records with the dispensing records of Pharmacy and reconciliation;

(d)     providing information for periodic self-assessments performed by the Covered Entity or independent audits;

(e)     maintaining records and reports that directly pertain to Covered Entity's compliance with the drug resale or transfer prohibition and prohibition of duplicative discounts, as well as prescription files, velocity reports and recodes of ordered and receipt required under this Agreement, the 340B Program, and by any applicable federal or state law or regulations;

(f)     permitting audits of Pharmacy's facilities, inventory and records by Covered Entity, pharmaceutical manufacturers, HRSA, HHS Inspector General, FDA, CMS, and any other governmental agency with jurisdiction and as otherwise required by law and this Agreement

(g)     payor contracting, billing and collections, account management, and other support necessary to process claims, receive reimbursements, processing of co-payments and deductibles for medications, track and manage data required to receive rebates and discounts, pay pharmacy, Covered Entity and 340B invoices on a timely basis and maintain payor relationships;

(h)     maintain drug formulary maintenance for the Covered Entity as appropriate; provide drug-related information services to Covered Entity clinical personnel and identify and dispose, through DEA registered reverse distributors any Eligible Drugs in their inventories which are or have expired. Such formulary as well as purchases of OTC or nonprescription medicine and products shall be developed in conjunction with the Covered Entity as appropriate and reviewed on a regular basis by the parties;

(i)     maintain and provide to Covered Entity on request, Eligible Patient prescription records; and

(j)     provide information as may be appropriate to Covered Entity for pharmaceutical education, pharmacoeconomic studies and counseling, including conducting Eligible Patient drug utilization review;

(k)     Determine if an Eligible Patient is covered by a governmental or private insurance program, drug manufacturer patient or other medication assistance program, including continuous electronic insurance eligibility checking and if covered, obtain the necessary authorization(s) or benefit payment for Eligible Drugs;


PCV


CW


MSS

(l)     Timely meeting all dispenser reporting requirements for a controlled substance to the Florida Health Department through the Electronic-Florida Online Reporting of Controlled Substances Evaluation (E-FORCSE);

(m)     Deliver prescriptions directly to Eligible Patients and/or deposit them in a secure dispensary at clinic sites for pick up in a variety of ways depending on the Eligible Patients' individual needs and preferences ranging from a concierge pick up location at BHCC's main site or utilizing third-party delivery to the Eligible Patients' homes;

(n)     Educate and train BHCC's assigned personnel on the administration and management of a pharmacy participating in the 340B Program and work with Covered Entity representatives to help educate and obtain current payor credentialing for its own pharmacy;

(o)     Exclusively negotiate all Group Purchasing Organization Agreements Legend drug supply agreements, agreements relating to drugs purchased under the 340B Program, and all GPO relationships on behalf of the Covered Entity;

(p)     Develop and deliver in conjunction with Covered Entity educational and outreach programs and marketing designed to promote an understanding of the 340B Program and the benefits and incentives of Pharmacy's 340B Program, including a patient feedback and complaint system to address quality of care issues.

(q)     Maintain required licensure for all of its personnel as well as to apply for and obtain memberships and designations as may be reasonably requested by Covered Entity consistent with its mission and services provided.

(r)     Accurately complete and submit on a timely basis documents which may be reasonably required to initiate and maintain the services contemplated under this Agreement.

(s)     Pharmacy shall render professional advice and pharmacy services to Eligible Patients of Covered Entity using the same standards of care applicable to other Pharmacy patients. Pharmacy shall be solely responsible for its acts and omissions regarding the professional advice and pharmacy services it provides. Pharmacy agrees to render Pharmacy Services in accordance with professional standards applicable to pharmacy services and the rules and regulations of the applicable State Board of Pharmacy as well as all applicable federal laws and regulations.

While under this agreement, Pharmacy shall make every reasonable attempt necessary to gain access to each PBM network, state-operated or state-funded AIDS drug purchasing assistance programs, governmental or private insurance programs, or drug manufacturer patient assistance program under which the Covered Entity's patients have current coverage (collectively, "Networks"). If for any reason the Pharmacy is not able to gain access timely, then Pharmacy shall propose the necessary action plan(s) to ensure proper patient adherence coverage and continuity of care. Delays in gaining access to the Networks will not be considered non-performance or breach of the Agreement.


PCV


CW


MSS

**8. Pharmacy Performance Standards.**

(a)    Pharmacy will provide Covered Entity direct access to a pharmacist during its regular business hours.

(b)    Pharmacy will provide Covered Entity 24/7 on-call access to a pharmacist during non-business hours for emergencies.

(c)    Pharmacy will provide Covered Entity 24/7 access to a dedicated fax or e-prescribing system for prescription transmission. Pharmacy will process all new prescriptions and refills upon receipt, the same day, if received by 3 P.M. (or by the next business day if after 3 P.M.), unless there is an insurance or a drug utilization review issue. If there is an insurance rejection issue, Pharmacy will diligently pursue resolution and notify Covered Entity of any material issue that remains unresolved for more than two (2) business days, or immediately if patient care is at risk.

(d)    Pharmacy will monitor all Eligible Patients requiring refills for medication adherence on a monthly or other applicable frequency basis.

(e)    Pharmacy will notify Covered Entity of any material medication adherence issues upon discovery.

(f)    Pharmacy will provide services at the on-site pharmacy and at the other Covered Entity clinic locations for up to 40 hours a week with sufficient pharmacists and technicians as needed. Additional hours of non-emergency coverage at the request of the Covered Entity will be provided at cost to the Covered Entity.

(g)    Pharmacy will NOT provide "price matching cash retail" services, wholesale pharmacy services, medical supplies or other ancillary products.

(h)    Pharmacy shall designate a liaison who is knowledgeable about the issues that affect the Covered Entity and the Pharmacy in order to keep the lines of communication open, coordinate activities, achieve the best utilization of resources and services, resolve any issues and develop action items to address matters that may arise from this contract and the relationship of the parties. Pharmacy and Covered Entity may agree to designate the same liaison.

**9. Covered Entity Obligations.**

(a)    Covered Entity will provide adequate Pharmacy access to Covered Entity patient records, including medication and patient demographics, to facilitate enrollment of eligible patients into the services under this Agreement.

(b)    Covered Entity will allow Pharmacy to service any and all of its 340B eligible patient/s from its Affiliated Pharmacies that are registered with HRSA as contract pharmacies of Covered Entity.

(c)    Covered Entity will manage initial and on-going outreach and communication to all Eligible Patients to enable enrollment into the services provided under this agreement.

(d)     Covered Entity will manage initial and on-going education of Eligible Prescribers and provider clinical and non-clinical staff about Pharmacy Services.

(e)     Covered Entity understands that it is Covered Entity's responsibility to determine the eligibility of each patient to receive Eligible Drugs under this Agreement. Covered Entity will communicate such eligibility, and changes to such eligibility to Pharmacy immediately. Covered Entity will also provide clear Eligible Patient, guidelines, including insurance type, eligible prescriber(s), eligible site(s) of service, eligible disease conditions and eligible medication classes for services to be provided under this Agreement. Covered Entity will be responsible for updating and communicating these guidelines immediately to Pharmacy.

(f)     Covered Entity will establish guidelines for the management of patient hardship situations.

(g)     Covered Entity will stay current with all wholesaler payments, where applicable, to avoid disruptions in services from Pharmacy.

(h)     Covered Entity will accurately complete and submit on a timely basis documents which may be reasonably required to initiate and maintain the services contemplated under this Agreement.

(i)     Covered Entity shall designate a liaison who is knowledgeable about the issues that affect the Covered Entity and the Pharmacy in order to keep the lines of communication open, coordinate activities, achieve the best utilization of resources and services, resolve any issues and develop action items to address matters that may arise from this contract and the relationship of the parties. Covered Entity and Pharmacy may agree to designate the same liaison.

## 10. Third Party Billing

(a)     Pharmacy shall bill for all Eligible Drugs that it dispenses on behalf of Covered Entity in accordance with the contracts and agreements that Pharmacy has with insurers and other payers. Pharmacy will make reasonable business efforts for it or its affiliates to be contracted or enrolled with payers. However, Covered Entity acknowledges that Pharmacy makes no promises, assurances, warranties or representations that it will become contracted or enrolled with a particular payer or program, unless otherwise specified herein, and Pharmacy shall have no liability to Covered Entity in the event that Pharmacy is unable, notwithstanding the exercise of its reasonable business efforts, to obtain a particular contract or enrollment.

(b)     Pharmacy shall submit claims to insurers and other payers under Pharmacy's provider number, pursuant to agreements and/or contracts that Pharmacy has in place with such payers. Pharmacy shall collect all payments received for Eligible Drugs dispensed by Pharmacy pursuant to this Agreement. The parties agree and acknowledge that no Medicaid Fee-For-Service patients shall receive pharmacy services under this Agreement, utilizing Eligible Drugs, unless appropriate procedures are in place to avoid double discounts. Such procedures shall and must be acceptable to both parties. This provision only applies to Eligible Drugs that would be billed to Medicaid for reimbursement and is not applicable to eligible and non-Eligible Drugs that Pharmacy may lawfully dispense to Covered Entity's patients.

PCV
PCV


8
CW

MSS

## 11. Payment for Pharmacy Services.

Covered Entity shall pay Pharmacy a dispensing fee for Pharmacy Services for each Eligible Drug dispensed to an Eligible Patient (the "Dispensing Fee") as set forth below. Covered Entity shall timely pay Pharmacy the Dispensing Fees and any other fees identified in this Contract in accordance with the terms provided in this Agreement and as described in below:

    (a)    **Dispensing Fees.** Covered Entity shall pay Pharmacy a Dispensing Fee equal to Eighteen and One-half Percent (18.50%) of gross program revenue, which shall mean the total payments/reimbursements collected by Pharmacy (including Affiliated Pharmacies and Borinquen Pharmacy dispensing to Eligible Patients on behalf of Covered Entity) (including all applicable credits and rebates), or a minimum of Ten and No/100 Dollars ($10.00) for each Eligible Drug filled for Eligible Patients. Gross program revenue shall include all amounts reimbursed by all third-party payors; including insurers, State operated or funded AIDS drug purchasing assistance programs, governmental, private insurance programs, drug manufacturer patient assistance programs as well as all cash payments due from patients, including co-payments.

    (b)    **Minimum Fees.** Regardless of reimbursements, Covered Entity shall pay Pharmacy either a Dispensing Fee of 18.5% or a minimum of Ten Dollars and No/100 ($10.00) for each Eligible Drug filled for an Eligible Patient.

    (c)    **Volume Discounts.** For negotiating contracts with 340B participating manufacturers, wholesalers and distributors ("Qualifying Suppliers") for Covered Entity's purchase of Eligible Drugs, Covered Entity may receive a Volume Discount pro-rata credit equal to the Savings Amount for each purchase of 340B Covered Drugs from Qualifying Suppliers. The Savings Amount is the difference between the Qualifying Supplier's standard purchase price and any volume purchase discount price negotiated by Pharmacy, as set forth in the Qualifying Supplier's invoice, the purchase agreement, or other documentation from the Qualifying Supplier. The parties agree and acknowledge that the Pharmacy's fee pursuant to this discount provision is fair compensation for its efforts in establishing and maintaining a relationship with the Qualifying Supplier(s) and negotiating the discount(s) and shall be payable for so long as it is disclosed and reported to Covered Entity, Covered Entity is not subject to a statutory GPO prohibition under the 340B Program and chooses to purchase Covered Drugs from the Qualifying Supplier(s) during the term of this Agreement. Covered Entity acknowledges that it is aware of the prohibition on kickbacks and the applicable reporting requirements with respect to discounts as set forth in 42 C.F.R. § 1001.952(h). Pursuant to 42 C.F.R. § 1001.952(h)(5), the term discount does not include rebates which are paid or payable to the Covered Entity and are defined in 42 C.F.R. § 1001.952(h)(4). Covered Entity hereby represents and warrants that it will comply with any applicable discount reporting requirements set forth in 42 C.F.R. § 1001.952(h). If Pharmacy on behalf of Covered Entity or Covered Entity on its own behalf enters into any GPO contracts, same shall not be violative of any other provisions of law, including the 340B program. Pharmacy and Covered Entity shall each meet their respective payment practices obligations or responsibilities pursuant to 42 C.F.R. § 1001.952.

PCV


CW

MSS

(d)     **Self-Pay Patients.** Patients without prescription drug coverage may receive Covered Drugs through the 340b Pharmacy Program. Patients will either pay full medication costs (discounted drug cost plus fees) or will receive full or partial coverage through a government medication assistance program, grant or a drug manufacturer patient assistance program or from Entity. Pharmacy will administer these uninsured programs on behalf of Entity. Entity can establish a fee scale for uninsured 340b-eligible Patients which are not eligible for any drug assistance program. Entity will assign all Patients to a group with a corresponding group code, based on a uniform method (such as ability to pay or poverty level sliding fee scale). 340b eligible Patient's fee scale will be linked to the group code and used at the time of Claim Adjudication to determine the appropriate share of cost or copayment to be paid by Patient and collected by Pharmacy. The proper group code must be indicated on all 340b prescriptions, vouchers or electronic prescribing templates for all 340b prescriptions.

(e)     **Patient Financial Assistance Program.** In order to increase access to 340B Drugs and improve medication compliance for all Eligible Patients, Covered Entity may at its discretion establish a medication Financial Assistance Program ("Assistance Program"). The Assistance Program would provide financial assistance to Eligible Patients to help offset copay costs for third party covered prescriptions and will be administered solely between Covered Entity and Pharmacy. The Assistance Program would be funded by Covered Entity from the net revenues (program income) received. Covered Entity and Pharmacy will notify Eligible Patients of the availability and advantages of this Program upon an unsolicited expression of financial need by the Eligible Patient. For Eligible Patients identified by Covered Entity whose prescriptions are not reimbursable by any third-party payor ("Self-Pay Eligible Patients"), Covered Entity shall pay Pharmacy the drug's actual acquisition cost plus a markup equal to Ten and No/100 ($10.00) for each Eligible Drug filled for Eligible Patients.

The parties represent and warrant that they have freely negotiated the terms of this Agreement and neither has offered or received any inducement or other consideration from the other party for entering into this Agreement. The Dispensing Fee to be paid to Pharmacy is for bona fide, legitimate services, is consistent with fair market value in arms-length transactions for Pharmacy Services, and is not determined in a manner to induce referrals or business otherwise generated between the parties for which payment may be made in whole or in part under a federal or state health care program. Nothing in this Agreement shall be construed to require Covered Entity to make referrals of patients to Pharmacy.

## 12. On-Site Pharmacy.

(a)     Pharmacy will establish a pharmacy on-site as soon as practical at Covered Entity's main site located at 3601 Federal Highway, Suite 125, Miami, FL 33137. The parties understand and agree that there is currently a fully-licensed pharmacy operating on the main site in Suite 125 and that improvements, if any are projected to be nominal. Pharmacy may at its election, spend a maximum of $50,000.00 towards painting, repairs and decorations and furnishings, and appropriate patient consultation areas which may be required for the pharmacy.

(b)     For any On-Site Pharmacy remodeling or construction, Covered Entity shall:



PCV



10
CW



MSS

(i) provide accurate architectural drawings of the internal and external space at their expense;

(ii) assure that the building is compliant with all building and zoning codes related to construction, HVAC systems, Electrical work, Plumbing, Air quality, over ground and Underground work and other appropriate areas;

(iii) be responsible for any outlier costs resulting from correcting building or zoning issues as well as any unnecessary costs or specific requests from the Provider or Landlord;

(iv) provide adequate access to the building for conducting any required construction and improvements;

(v) provide plumbing and sewer access to the pharmacy space, including allowing for any overhead plumbing and sewer access where ground access is not reasonably accessible;

(vi) provide usual and customary perimeter security to the building;

(vii) provide a secure location for storage of construction equipment, buildout materials, fixtures, IT and other equipment and other Pharmacy property during the construction phase;

(viii) enable Pharmacy access to the building and the On-Site Pharmacy during clinic hours and after hours with notice to Covered Entity; and

(ix) provide the required HVAC system to meet the temperature storage requirements and working conditions of the pharmacy space;

(c) Covered Entity represents that it is the fee simple owner of the premises where the pharmacy is to be located (3601 Federal Highway, Miami, FL 33137). Pharmacy will lease space from Covered Entity pursuant to a written lease agreement on mutually agreed upon terms and conditions and at rental amounts consistent with fair market value.

13. <u>Accounting and Remittance of Net Balance of 340B program income to Covered Entity.</u>

Pharmacy or its designee shall make a monthly payment to Covered Entity in order to reconcile all collections and expenditures. When payments and reimbursements are received by the Pharmacy from third-party payors; including insurers, State operated or funded AIDS drug purchasing assistance programs, governmental, private insurance programs, drug manufacturer patient assistance programs, coupons as well as all cash payments due from patients, including co-payments, Pharmacy shall retain its fee for Pharmacy Services and remit the balance of payments, credits, rebates reimbursement received from any source to Covered Entity. The monthly payment due to the Covered Entity after all collections and expenditures, shall be provided within twenty-five (25) days after the close of each month. A year-end reconciliation and final accounting/payment shall be provided within sixty (60) days after Covered Entity's fiscal year-end. Payments under this Section 13 are contingent upon Pharmacy's receipt of funds from the applicable payers and Eligible Patient and amounts owed by Pharmacy will be off-set to account for any adjustment to reimbursement or retroactive denial made by a payor.



PCV

CW 11



MSS

**14. Patient Choice.**

Pharmacy and Covered Entity understand and agree that Eligible Patients of Covered Entity may elect not to use Pharmacy for Pharmacy Services. In the event that an Eligible Patient elects not to use Pharmacy for such services, the patient may obtain the prescription from the prescriber and then obtain the drug(s) from the pharmacy provider of his or her choice.

**15. Prohibition on Prescription Diversion and Transfer**

As described in HRSA guidance issued at 75 Fed. Reg. 10,272 (Mar. 5, 2010), the parties understand and agree that the Covered Entity is ultimately responsible for compliance with all 340B Program requirements and HRSA guidelines. The Covered Entity has full responsibility and accountability for compliance with all requirements to prevent dispensing of Eligible Drugs to individuals other than Eligible Patients, and to prevent situations in which a drug is subject to both the 340B discount and a Medicaid rebate claim. For purposes of this section, the term "Eligible Patients" has the same meaning as that term is defined and discussed in 61 Fed. Reg. 55156, or in such most recent definition of the term as may be formally established by HRSA, and it shall be Covered Entity's responsibility to determine whether or not an individual fits within this definition. To that end, the parties agree:

(a)     Covered Entity shall furnish a list to the Pharmacy of all qualified health care prescribers contracted or affiliated with Contract Pharmacy that may prescribe Eligible Drugs for Eligible Patients. Covered Entity shall periodically update the list of prescribers to reflect any changes and shall provide Pharmacy with the updated list. Pharmacy agrees that it will not dispense, resell or transfer an Eligible Drug to an individual unless such individual has a prescription from a health care prescriber on the list furnished by Covered Entity. Pharmacy shall have no liability to Covered Entity in the event that Covered Entity fails to furnish this list and keep it updated and accurate.

(b)     Pharmacy shall furnish an eligibility enrollment referral form to Covered Entity for Covered Entity's use in submitting prescriptions to Pharmacy. The Eligibility Form will require Covered Entity to supply information about the patient, the prescriber, the patient's insurance, and whether the patient is an Eligible Patient, among other things. Covered Entity shall designate an employee or agent to be responsible for answering any questions the Pharmacy may have about a completed or incomplete form. Pharmacy shall not dispense, resell or transfer an Eligible Drug to an individual unless such individual has been designated an Eligible Patient on the Eligibility Form, or until Covered Entity's designee supplies Pharmacy with a written statement that the prescription is for an Eligible Patient and that Pharmacy is authorized to fill the prescription prior to the form's completion. Pharmacy shall have no liability to Covered Entity in the event that Covered Entity makes a mistaken designation of Eligible Patient on the form or Covered Entity's designee instructs Pharmacy to fill a prescription without the submission of a completed Eligibility Form.

(c)     In the event that either party discovers that Eligible Drugs have been dispensed, resold or transferred to an individual who either is not an Eligible Patient or who has Medicaid-Fee-For-Service prescription coverage, then that party shall promptly provide written notice to the other party of the specific prescription(s) at issue. Covered Entity shall be responsible for determining and implementing the actions necessary to remediate the incident(s) of non-


PCV


12
CW


MSS

compliance and ensure compliance with 340B requirements, and Pharmacy shall use reasonable business efforts in good faith to comply with Covered Entity's remediation efforts.

(d)     Pharmacy shall not be required to pay Covered Entity the amount of the price discount that Covered Entity received from the manufacturer or wholesaler for the Eligible Drug, or otherwise be financially liable to Covered Entity for the incident(s) of non-compliance, unless Pharmacy's failure to comply with its obligations under this Agreement was the proximate cause of such incident(s) of non-compliance. In the event that Pharmacy is the proximate cause of the incident(s) of non-compliance, the Pharmacy reserves the right to cure by conducting a credit and rebill of the non-compliant transactions and reverse the transactions on Covered Entity's account in lieu of simply paying Covered Entity the amount of the price discount.

## 16. Medicaid Prescriptions.

Covered Entity will not use Eligible Drugs to dispense prescriptions paid for by fee-for-service Medicaid unless Covered Entity, Pharmacy, and the relevant state agency responsible for Medicaid oversight have established an arrangement to prevent duplicate discounts and/or rebates. Any such arrangement shall be reported to OPA. This same restriction will apply to prescriptions paid for by Medicaid managed care organizations, provided the parties determine that HRSA requires or enforces such restriction.

## 17. Audits.

(a)     The parties understand and agree that both Pharmacy and Covered Entity are subject to audit by DHHS and by drug manufacturers who have signed a pharmaceutical pricing agreement with DHHS, which audits may pertain to the Covered Entity's compliance with the prohibition on drug resale or transfer and the prohibition on duplicate Medicaid rebates and discounts. The parties agree to cooperate with such audits and to comply with applicable audit guidelines. In the event either party receives notice of such an audit, it shall immediately inform the other party to the extent such audit relates to this Agreement and if such notice is reasonable and permitted under the circumstances. In the event the Agreement or Attachments must be provided pursuant to an audit, each party shall take reasonable measures to limit the provision of any information in this Agreement and Attachments, to the extent permitted by law, which it considers to be proprietary and confidential prior to submitting the Agreement to the requesting entity. The provisions of this Section 17 shall survive the expiration or termination of this Agreement for any reason.

(b)     Pharmacy grants Covered Entity, and its duly authorized representatives, the right, on behalf of Covered Entity, to enter pharmacy premises, audit its books and records, including all electronic records, to verify and ensure compliance with the duties, obligations and financial integrity of all transactions outlined herein. Any such audit shall be conducted during reasonable business hours, upon (30) thirty days prior written notice or as required by law, and in a manner so as not to interfere with the conduct of Pharmacy's business. Pharmacy agrees to use commercially reasonable efforts to cooperate with such audits in good faith.

(c)     Upon written request by OPA to the Covered Entity, a copy of this Agreement will be provided to OPA.

PCV
PCV

13
CW

MSS
MSS

## 18. Term and Termination.

(a) **Term.** This Agreement shall take effect on the Effective Date set forth above and shall continue in force and effect for five (5) years thereafter ("Initial Term"). After the Initial Term, this Agreement shall automatically renew for subsequent terms of five (5) years each (each a "Renewal Term"), unless either party provides written notice to the other party of its intent to terminate this Agreement no later than ninety (90) days before the end of the Initial Term, or any Renewal Term, or unless earlier terminated as provided below.

(b) **Termination without Cause.** The parties may terminate this Agreement at any time by mutual written agreement.

(c) **Termination for Cause.** Either party may terminate this Agreement for material breach by the other party, provided however, that prior to any such termination, the non-breaching party shall provide written notice specifying in detail the nature of the breach and granting the breaching party sixty (60) days to effect a cure of the breach. If the breaching party cures the breach within such time period to the satisfaction of the non-breaching party, the Agreement shall not be terminated.

(i) If the non-breaching party contends that the breach has not been cured within such time period notwithstanding the breaching party's offer of proof that the breach has been cured, then the parties agree that they shall engage in an informal settlement process whereby at least one representative of each party shall meet in person to discuss and attempt in good faith to reach a resolution of the dispute. The meeting shall occur within ten (10) days of the date that the non-breaching party alleges that the breaching party has failed to cure the breach, unless the parties mutually agree to conduct the meeting at a later date. Either party may request that its attorney attend the meeting in person or by telephone, and the parties may mutually agree, if they both desire, to have a practicing attorney (who is neither party's attorney) or a retired judge formally mediate the meeting, provided that the parties will equally split the mediator's costs and fees.

(ii) In the event that the non-breaching party continues to allege a breach following the conclusion of this settlement process, then the Agreement shall be deemed terminated.

(iii) If the breaching party refuses to engage in this settlement process as provided herein, then the non-breaching party shall have the right to immediately declare this Agreement terminated. If the non-breaching party refuses to engage in this settlement process, then the breaching party shall have the right to declare the non-breaching party to be in material breach of the Agreement and may, at its option and without further notice or demand of any kind, terminate this Agreement.

(d) **Immediate Termination.** Either party may also terminate this Agreement, effective immediately upon the giving of written notice, if the other shall: (a) suspend or discontinue its business operations; (b) file or have filed against it a petition in bankruptcy which is not dismissed within sixty (60) days of filing, or be adjudicated bankrupt; (c) make a general assignment for the benefit of its creditors; (d) be voluntarily or involuntarily dissolved or have a



PCV

14
CW



MSS

receiver, trustee, or other court officer appointed with respect to its property which is not dismissed within sixty (60) days of appointment; or (c) be disbarred or suspended from participation in Medicare, Medicaid or any other state of federal health care payment program. Covered Entity shall provide immediate notice to Pharmacy if Covered Entity is no longer deemed to be a 340B Covered Entity, which notice immediately terminates this Agreement.

(e)    **Obligations upon Termination.**   Upon any termination or expiration of this Agreement, all rights and obligations of the parties shall cease except: (i) those rights and obligations that have accrued and remain unsatisfied prior to the termination or expiration of this Agreement; (ii) those rights and obligations that expressly survive termination or expiration of this Agreement; and (iii) the party's respective professional ongoing obligations, if any, with respect to any patients.

## 19. Representations of Pharmacy.

Pharmacy represents to Covered Entity that:

(a)    it employs, and will continue to employ throughout the term of this Agreement, sufficient qualified and credentialed personnel needed to manage and operate the Pharmacy and provide the services anticipated hereunder in a timely, professional, competent and ethical manner;

(b)    it owns, possesses and employs, and will continue to employ throughout the term of this Agreement, sufficient technology and equipment as needed to manage and operate the Pharmacy and provide the services in the manner anticipated hereunder;

(c)    it will render the Pharmacy Services in accordance with prevailing pharmaceutical and medical standards that are applied in the same fashion to all patients of Covered Entity, as applicable to Pharmacy;

(d)    it will render the Pharmacy Services to Eligible Patients and to the public without regard to race, creed, color, age, sex, sexual orientation, citizenship, marital status, veteran status, national origin, disability, religion, arrest record or other protected status;

(e)    it will not use drugs purchased under the 340B Program to dispense Medicaid prescriptions, except as provided in an arrangement with the state Medicaid agency, including Medicaid Managed Care Plans and as approved by BHCC to prevent duplicate discounting;

(f)    ensure that all of its employees, agents, representatives and members of its workforce, whose services may be used to fulfill obligations under this Agreement are or shall be appropriately informed of the terms of this Agreement and are under legal obligation to Pharmacy, by contract or otherwise to enable Pharmacy to fully comply with all provisions of this Agreement including, without limitation, the requirements, modifications or limitations that BHCC has agreed to with regards to the use and disclosure of Protected Health Information and diversion prevention;

(g)    the signatory of this agreement, representing Pharmacy, has full power and authority to execute this Agreement and comply with all of its duties and responsibilities, as approved by the owners of its organization and its Managers and


PCV


15
CW

MSS

(b)    it has the authority to enter into this Agreement and will perform its responsibilities hereunder in a professional and diligent manner consistent with industry standards reasonably applicable to the performance thereof.

## 20. Representations of Covered Entity and Pharmacy.

Covered Entity and Pharmacy each represent to the other that:

(a)    all of its employees, agents, representatives and members of its workforce, whose services may be used to fulfill obligations under this Agreement are or shall be appropriately informed of the terms of this Agreement and are under legal obligation, by contract or otherwise, sufficient to enable each of Covered Entity and Pharmacy to fully comply with all provisions of this Agreement;

(b)    neither they, nor their respective shareholders, members, directors, officers, agents, employees or members of its workforce:

(1)    have been convicted of a criminal offense that would trigger exclusion pursuant to 42 USC 1320a-7(a) or (b) unless such entity or individual has been reinstated; or

(2)    is listed by a Federal agency as currently suspended, debarred, excluded or otherwise ineligible for State or Federal program participation.

(c)    it will notify the other after it becomes aware that any of the foregoing representations and warranties may be inaccurate or may become incorrect, or if it is being investigated in connection with any federal or state healthcare program.

(d)    it will notify the other if it becomes aware of any suspected fraud or abuse related to the 340B Program as it relates to this agreement, and the parties shall work together to investigate and resolve any suspected fraud or abuse issues.

## 21. Representations of Covered Entity.

Covered Entity represents to Pharmacy that:

(a)    it is a Covered Entity as defined in the 340B Program as of the time this Agreement is executed and at all times during the Term of the Agreement unless Covered Entity provides Pharmacy notice pursuant to Section 35 of this Agreement;

(b)    the signatory of this agreement, representing the Covered Entity, has full power and authority to execute this agreement and comply with all of its duties and responsibilities, as approved by the owners of its organization and its Board of Directors;

(c)    it has the authority to enter into this Agreement and will perform its responsibilities hereunder in a professional and diligent manner consistent with industry standards reasonably applicable to the performance thereof;



16

CW

PCV
PCV



MSS

    (d)    it shall be ultimately responsible for determining whether a patient is an Eligible Patient and whether a claim is 340B-eligible;

    (e)    it will take reasonable and necessary steps to prevent diversion of 340B products;

    (f)    it shall be responsible for complying with the Medicaid duplicate discount prohibition; and

    (g)    it shall make itself available for audit by pharmaceutical manufacturers as well as state and federal agencies, as required by applicable law.

## 22. Patient Privacy and HIPAA Compliance:

    The parties recognize that each party is a healthcare provider and a covered entity within the meaning of the federal Health Insurance Portability and Accountability Act ("HIPAA"), that Covered Entity operates a and a federally-assisted drug and alcohol treatment program that must comply with the Federal Confidentiality of Patient Records law and regulations (42 C.F.R. Part 2). The parties agree to protect and respect the patient's right to privacy and confidentiality concerning their medical and pharmaceutical records, and to protect all individually identifiable health information as protected health information from misuse or disclosure, in compliance with all applicable state and federal law and shall contemporaneously execute a separate Business Associate Agreement. Without limiting the generality of the foregoing, the parties agree to use patient-specific information: (i) only for permitted treatment, billing and related record-keeping purposes; or (ii) as otherwise permitted by law. In the event that any patient information created, maintained or transmitted in connection with this Agreement is to be transmitted electronically, the parties agree that they shall comply in all respects with the requirements of HIPAA governing electronic transmission of individually identifiable patient information. Failure by either party to abide by these requirements shall be a basis for immediate termination of this Agreement.

## 23. Ownership/Use of Data.

    Subject to applicable law, all information generated in the performance of this Agreement, including all patient information submitted by Pharmacy pursuant to this Agreement, shall be available for use by both parties. These provisions shall not prohibit Pharmacy from owning data specific to its patients and created by Pharmacy. Covered Entity acknowledges that Pharmacy retains the non-exclusive right to and ownership of all pharmacy records and information contained therein, including without limitation, patient identifiable data related to or generated in connection with Pharmacy's lawful activities such as studies, data, and reports for third party organizations. Except as required by Pharmacy to conduct its legitimate business activities and as permitted by law, any data which is transmitted by Pharmacy to any third-parties will be de-identified in compliance with HIPAA and the Federal Confidentiality of Patient Records law and regulations (42 C.F.R. Part 2).





17



## 24. Confidentiality and Non-Solicitation.

(a)     In the course of performing under this Agreement, either of the parties may receive, be exposed to or acquire Confidential Information including but not limited to, all information, data, reports, records, summaries, tables and studies, whether written or oral, fixed in hard copy or contained in any computer data base or computer readable form, as well as any information identified as confidential of the other party ("Confidential Information"). Without limiting the foregoing, the parties acknowledge and agree that this Agreement, including the pricing terms of this Agreement, constitutes Confidential Information. The parties, including their respective employees, agents or representatives (i) shall not disclose to any third party the Confidential Information except as otherwise permitted by this Agreement, (ii) only permit use of such Confidential Information by employees, agents and representatives having a need to know in connection with performance under this Agreement, and (iii) advise each of their employees, agents, and representatives of their obligations to keep such Confidential Information confidential. Notwithstanding anything to the contrary herein, each party shall be free to use, for its own business purposes, any ideas, suggestions, concepts, know-how or techniques contained in information received from each other that directly relates to the performance under this Agreement.  This provision shall not apply to Confidential Information: (1) after it becomes publicly available through no fault of either party hereto; (2) which is later publicly released by either party hereto in writing; (3) which is lawfully obtained from third parties without restriction as established by written documentation; or (4) which can be shown to be previously known or developed by either party hereto independently of the other party as established by written documentation.

(b)     During the Initial Term and any Renewal Term of this Agreement, and for one year following the termination of this Agreement for any reason, Covered Entity shall not directly or indirectly hire, seek to hire or assist in hiring any employee, agent or independent contractor of the Pharmacy, including, but not limited to, an individual performing services at an On-Site Pharmacy, or induce or seek to induce or take action which results in the termination of employment or other arrangements between Pharmacy and such employee, agent or independent contractor or otherwise interferes with such employment or contractual arrangements.

(c)     Each of the parties acknowledges and agrees that any breach by it of any of the provisions of Section 24 ("Restrictive Covenants") would result in irreparable injury and damage for which money damages would not provide an adequate remedy. Therefore, if either party hereto breaches, or threatens to commit a breach of, any of the Restrictive Covenants, the other party shall have the right and remedy (upon compliance with any necessary prerequisites imposed by law upon the availability of such remedy), which shall be independent and severally enforceable, and which shall be in addition to, and not in lieu of, any other rights and remedies available to it under law or in equity (including, without limitation, the recovery of damages), to have the Restrictive Covenants specifically enforced (without posting bond and without the need to prove damages) by any court having equity jurisdiction, including, without limitation, the right to an entry against breaching party of restraining orders and injunctions (preliminary, mandatory, temporary and permanent), without posting bond and without the need to prove damages, against violations, threatened or actual, and whether or not then continuing, of such covenants.  The existence of any claim or cause of action by the breaching party, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of the Restrictive


PCV


18
CW

MSS

Covenants. In addition, any breach of the Restrictive Covenants shall constitute a material breach of this Agreement.

### 25. Insurance.

(a)     Each party hereto shall procure and maintain the following insurance: (i) general and professional liability coverage (including without limitation malpractice liability, product liability and contractual liability), in an amount not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, for bodily injury and property damage and (ii) automobile liability insurance for owned, non-owned and hired automobiles in an amount not less than One Million Dollars ($1,000,000).

(b)     Each party shall make a good faith effort to assure that its insurance policy shall provide for written notification to the other party by the insurer not less than thirty (30) days prior to cancellation, expiration or material change in insurance coverage. Upon request of the other party, either party shall furnish the other party with any Certificates of Insurance relevant to this Agreement.

### 26. Indemnification.

(a)     Pharmacy shall indemnify, defend and hold harmless Covered Entity and its parents, subsidiaries and affiliates, and their respective officers, directors, employees, agents and representatives, from and against any and all liabilities, claims, demands, actions, causes of action, losses, judgments, damages, costs and expenses, including reasonable attorneys' fees, directly resulting from: (i) a breach by Pharmacy of any of its representations, warranties, covenants or agreements in this Agreement, or (ii) any negligent or wrongful acts or omissions of Pharmacy in connection with the performance of this Agreement. Pharmacy shall also indemnify, defend and hold harmless Covered Entity should Pharmacy's consultants or employee be deemed employees of Covered Entity.

(b)     Covered Entity shall indemnify, defend and hold harmless Pharmacy and its parents, subsidiaries and affiliates, and their respective officers, directors, employees, agents and representatives, from and against any and all liabilities, claims, demands, actions, causes of action, losses, judgments, damages, costs and expenses, including reasonable attorneys' fees, directly resulting from: (i) a breach by Covered Entity of any of its representations, warranties, covenants or agreements in this Agreement, or (ii) any negligent or wrongful acts or omissions of Covered Entity in connection with the performance of this Agreement. Covered Entity shall also indemnify, defend and hold harmless Pharmacy should Covered Entity's consultants or employee be deemed employees of Pharmacy.

(c)     This provision shall survive termination of the Agreement.

### 27. Compliance with Laws.

The parties hereto shall comply with all applicable federal, state and local laws, rules, regulations and requirements.

PCV

CW
19

MSS

## 28. Change in Law.

(a)    The parties acknowledge that existing regulations and laws may change and that the courts or state or federal agencies with appropriate jurisdiction may change their interpretation of existing law. Upon the enactment or amendment of any state or federal law or regulation, or upon the issuance of any judicial opinion or interpretative ruling of any existing state or federal law or regulation, that: (i) renders this Agreement illegal, (ii) materially changes the obligations of the parties, or (iii) jeopardizes the tax-exempt status or grants funding of a party or creates a significant risk of civil penalties, as determined in the reasonable opinion of counsel for the party asserting that there has been a change in law, the parties shall use their best efforts during the thirty (30) day period thereafter to mutually agree to such amendments to this Agreement as to permit its valid and legal continuation. If, after such thirty (30) day period, the parties are unable to agree to amend the Agreement, either party may terminate this Agreement effective immediately by giving written notice of termination to the other party.

(b)    In the event of a change in law that puts Covered Entity into non-compliance with the diversion or duplicate discount prohibitions, Covered Entity may request immediate suspension of the parties' operation under this Agreement until such time as this Agreement can be modified to accommodate such Change in Law. Pharmacy shall review request for suspension of operation in good faith but shall not be obligated to grant such request if it reasonably disagrees with Covered Entity's determination that it has been placed into non-compliance; provided, however, that Pharmacy may be liable under the Indemnification provisions of this Agreement if its unreasonable refusal to suspend operation of the Agreement results in any damage or harm to Covered Entity.

## 29. Dispute Resolution.

Any controversy or claim arising out of or relating to this Agreement or alleged breach of the Agreement that cannot be resolved by the parties meeting and conferring should first be referred to mediation at a mediation service agreed to by the parties. The parties covenant that they will engage in mediation in good faith and will share equally in the cost of mediation. Any controversy or claim arising out of or relating to this agreement including any action brought to enforce this Agreement or for breach thereof must be brought in the State or Federal Courts located in Miami Dade County, Florida.

## 30. Choice of Law.

This Agreement shall be interpreted according to the substantive laws of the State of Florida, without reference to its conflict of laws principles.

## 31. Third-Party Rights.

This Agreement is intended solely for the mutual benefit of the parties hereto and there is no intention, expressed or otherwise, to create any rights or interests for any other party or person other than Pharmacy and Covered Entity other than as specifically indicated herein.

PCV
PCV


CW

MSS

**32. Force Majeure.**

Neither party shall be liable for nonperformance or defective or late performance of any of its obligations under this Agreement to the extent and for such periods of time as such nonperformance, defective performance or late performance is due to reasons outside such party's control; including: acts of God, war (declared or undeclared), action of any governmental authority, riots, revolutions, fire, floods, explosions, sabotage, nuclear incidents, catastrophes, lightning, weather, earthquakes, storms, sinkholes, epidemics, or labor strikes.

**33. Entire Agreement; Amendment.**

This Agreement and its Attachments represent the entire understanding of the parties in the subject matter hereof. Such attachments are incorporated herein and made a part hereof. There are no other agreements or understandings among the parties, either oral or written, relating to the subject matter hereof. Any amendments to this Agreement shall be in writing and signed by all parties hereto except in the following provision.

Covered Entity acknowledges and agrees that Pharmacy is affiliated with other pharmacies under common ownership with Pharmacy, and that such Affiliated Pharmacies operate as part of a pharmacy chain. The Affiliated Pharmacies are duly licensed in their respective states. From time to time, Pharmacy may send a written amendment to be approved by Covered Entity which lists one or more of such affiliates as being added to the Agreement as a contracting pharmacy ("Pharmacy Listing Amendment"). Pharmacy reserves the right to make such amendment for the purpose of providing Provider and its patients with optimum services under this Agreement. In the event of a Pharmacy Listing Amendment, the term "Pharmacy" in the Agreement shall be interpreted to include each Affiliated Pharmacy listed in the amendment.

**34. Waiver.**

No failure or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, or privilege preclude any other or further exercise thereof.

**35. Notice.**

All notices required or permitted to be given hereunder to any party hereto shall be in writing, and shall be effective upon receipt, when delivered by Federal Express, Unites States Mail or common carrier to either parties' addresses listed below or as changed by either party by delivering a written notice of a change of address to the other party from time to time. •

Pharmacy:    ICARE RX LLC
             c/o 1145 Broadway Street, 2nd Floor
             East McKeesport, PA  15035

Covered Entity:    Borinquen Health Care Center, Inc.
                   c/o Paul Carl Velez, CEO
                   3601 Federal Highway
                   Miami, FL  33137

PCV
**PCV**


CW

MSS

### 36. Non-Assignment.

This Agreement may not be assigned by any party without the prior written approval of the other party. However, so long as the assignment does not have the effect of reducing the quality of services being rendered by Pharmacy nor the volume and character of prescriptions being dispensed, either party may assign this Agreement to an entity that directly controls, is controlled by, or is under common control with the assigning party with written notice to and consent of the other party. In addition, Pharmacy in its reasonable discretion and when in the best interest of the Covered Entity, may assign any dispensing portion of this Agreement to an Affiliated Pharmacy upon prior written notice to Covered Entity.

### 37. Counterparts.

This Agreement may be executed in one or more counterparts, each of which will be considered an original, and all of which taken together will constitute one and the same instrument and will be effective as of the Effective Date. Signature execution by facsimile or other electronic means shall be considered binding.

### 38. Survival.

The provisions of this Agreement that by their nature are intended to continue in their effect following expiration or termination of this Agreement, shall survive any such expiration or termination of this Agreement

### 39. Drafting.

Both parties acknowledge and agree that they have participated in the drafting and negotiation, at arms-length, of this Agreement, and that both parties had the opportunity to be represented by counsel of their choice in connection with the drafting and negotiation of this Agreement. Accordingly, in the event of a dispute between the parties hereto with respect to the interpretation or enforcement of the terms hereof no provision shall be construed so as to favor or disfavor either party hereto.

### 40. Administration of Covered Entity's Pharmacy Program.

During the Initial Term and any Extended Term of this Agreement, unless otherwise agreed to in writing by the parties, Pharmacy together with Covered Entity's pharmacy (Borinquen Pharmacy) shall have sole and exclusive rights and authority to provide the Pharmacy Services described herein to Covered Entity (including any agents, affiliates, successors, or licensees), including the sole and exclusive right and authority to dispense Covered Drugs to Eligible Patients. Furthermore, unless otherwise agreed to in writing by the parties, Covered Entity shall not take any action that is designed to or has the effect of diluting the population of Eligible Patients at any of the Covered Entity's locations specified in this Agreement for the purpose of transferring the care of such patients to any other clinic owned or operated by Covered Entity or any of its agents, affiliates, successors or licensees, nor shall Covered Entity suggest, encourage, or solicit such patients to access the services of, or otherwise become the patients of, any other clinic owned or operated by Covered Entity or its agents, affiliates, successors or licensees for the purpose of becoming Eligible Patients pursuant to the 340B Program. Pharmacy agrees that during the term


PCV


22
CW


MSS

of this agreement and for a period of two (2) years after termination thereof, (whether same is by expiration and/or with or without cause), Pharmacy will not solicit or attempt to solicit (either directly or by assisting others) any business from Covered Entity's patients, for the purpose of providing services that are competitive with the type of services provided by Covered Entity. This restriction shall apply only to patients with whom, to the best of Pharmacy's knowledge, Covered Entity or its providers have a provider/patient relationship or which are actively being sought by Covered Entity. It is further understood and agreed by both the Covered Entity and the Pharmacy that a patient's freedom to choose his or her own provider of pharmacy services shall in no way be limited. It is anticipated that under this agreement, Covered Entity will continue to operate its own pharmacy which may be considered as an Affiliated Pharmacy for the purposes of dispensing prescriptions. It is also anticipated that during the term of this agreement, the Pharmacy will train Covered Entity personnel in the administration of the 340B Program for the purposes of permitting the Covered Entity to dispense to its own patients.

**41. Reciprocal Letters of Support.** If requested by, and to assist Pharmacy in maintaining and obtaining contracts and grants of whatever kind or nature, Covered Entity will provide support letters (in form and content prepared and reasonably requested by Pharmacy) for the purposes of references, qualifying for contracts and grants and any applicable requirements of Regulatory authorities and professional associations. Likewise, if requested by, and to assist Covered Entity in maintaining and obtaining grants and contracts of whatever kind or nature, Pharmacy will provide support letters (in form and content prepared and reasonably requested by Covered Entity) for the purposes of references, qualifying for grants and contracts and any applicable requirements of Regulatory authorities and professional associations.

IN WITNESS WHEREOF, the parties have executed this Agreement to become effective on the date and year first above written.

**Borinquen Health Care Center, Inc.**          **ICARE RX LLC**

By: _____          By: _____
Paul Carl Velez                              Chris Wakefield
Chief Executive Officer                      Authorized Signatory of ICARE

Date: 7/23/18                                Date: 7/2/2018


By: _____
Dr. Meir S. Sacks
Authorized Signatory of
ICARE
Date: 6-7-21-2018

PCV                         23 CW                        MSS

## (FIRST) PHARMACY LISTING AMENDMENT

WHEREAS, pursuant to the 340B CONTRACT PHARMACY SERVICES AGREEMENT between Borinquen Health Care Center, Inc. ("Borinquen") and ICARE RX LLC ("Pharmacy"), dated July 21, 2018 (the "PSA"), Pharmacy may assign part of its 340B dispensing responsibilities under the PSA to an Affiliated Pharmacy (as defined in the PSA), after reasonable notice of the assignment and reasons therefore being provided to Borinquen.

WHEREAS, Pharmacy may send a written amendment to be approved by Borinquen, listing an Affiliated Pharmacy to be added to the PSA as a contracting pharmacy.

WHEREAS, Pharmacy has provided notice requesting that an Affiliated Pharmacy, PRxP of New York LLC dba Broadway Family Pharmacy ("New York Pharmacy") be added to the PSA as an approved contracting pharmacy.

WHEREAS, New York Pharmacy will serve as the back-up pharmacy for the Pharmacy under the PSA, for the purposes of avoiding interruption to patient care and in the event that the Pharmacy is unable to service patients due to unforeseen circumstances (i.e. weather, power outages, etc.).

WHEREAS, the parties have agreed to remove Physicians Rx Pharmacy of Clinton, Inc. as an Affiliated Pharmacy under the PSA, and add New York Pharmacy as an Affiliated Pharmacy under the PSA.

NOW THEREFORE, in consideration of the above recitals, which are incorporated herein, Borinquen hereby approves the addition of New York Pharmacy as an Affiliated Pharmacy under the PSA, and the removal of Physicians Rx Pharmacy of Clinton, Inc. as an Affiliated Pharmacy under the PSA. On or before October 15, 2019, Borinquen shall take commercially reasonable steps to add New York Pharmacy to the DHHS's Office of Pharmacy Affairs database and website, with the contact information set forth below, and take all necessary and required steps to obtain approval of New York Pharmacy's registration thereunder:

**PRxP of New York LLC dba Broadway Family Pharmacy**
**510 Amsterdam Ave STR1 (South Store)**
**New York, NY 10024**
**Registration Information:**
**DEA FP5536442**
**Pharmacy Contact: Chris Wakefield**
**Title: Manager**
**Email: cwakefield@340bpharm.com**
**Phone: 412-357-5163**

After Borinquen has received confirmation from DHHS's Office of Pharmacy Affairs of the addition of New York Pharmacy to DHHS's Office of Pharmacy Affairs database and website, Borinquen will terminate Physicians Rx Pharmacy of Clinton, Inc. as a Borinquen contracted pharmacy on the DHHS's Office of Pharmacy Affairs database and website.

IN WITNESS WHEREOF, the parties have executed this (First) Pharmacy Listing Amendment, to become effective on the date executed by the parties.

**Borinquen Health Care Center, Inc.**

_____
Paul Carl Velez, CEO

_____
10/9/2019
Date

**ICARE RX LLC**

_____
Chris Wakefield, Manager
10/09/2019
_____
Date

2

## SECOND AMENDMENT TO 340B CONTRACT PHARMACY SERVICES AGREEMENT

**THIS AMENDMENT TO 340B CONTRACT PHARMACY SERVICES AGREEMENT** (this "Amendment") is effective as of 3/9/2020 , 2020 (the "Effective Date"), between Borinquen Health Care Center, Inc. ("Borinquen") and ICARE RX LLC ("Pharmacy").

### RECITALS

**WHEREAS**, pursuant to the 340B Contract Pharmacy Services Agreement between Borinquen and Pharmacy, dated July 21, 2018 (the "PSA"), Pharmacy's address was inadvertently removed from the final version of the PSA;

**WHEREAS**, Pharmacy and Borinquen desire to amend the PSA to include the address of the Pharmacy as part of the PSA.

**NOW THEREFORE**, in consideration of the above recitals, which are incorporated herein, and other good and valuable consideration, the parties hereto agree as follows:

1.      The name and address of the Pharmacy, effective as of the date of the PSA and at all times thereafter, until time as the address of the Pharmacy is further amended by Pharmacy's written notice to Borinquen of any change of address for the Pharmacy, is as follows:

> ICARE RX LLC
> 14447 Country Walk Drive
> Miami, FL  33186

2.      Except as set forth in this Amendment, the PSA remains in full force and effect.

**IN WITNESS WHEREOF**, the parties have executed this Amendment, effective as of the Effective Date.

**Borinquen Health Care Center, Inc.**          **ICARE RX LLC**

Paul Carl Velez, CEO                            Chris Wakefield, Manager
4/7/2020                                        3/9/2020
Date                                            Date

## (THIRD) PHARMACY LISTING AMENDMENT

WHEREAS, pursuant to the 340B CONTRACT PHARMACY SERVICES AGREEMENT between Borinquen Health Care Center, Inc. ("Borinquen") and ICARE RX LLC ("Pharmacy"), dated July 21, 2018 (the "PSA"), Pharmacy may assign part of its 340B dispensing responsibilities under the PSA to an Affiliated Pharmacy (as defined in the PSA), after reasonable notice of the assignment and reasons therefore being provided to Borinquen.

WHEREAS, Pharmacy may send a written amendment to be approved by Borinquen, listing an Affiliated Pharmacy to be added to the PSA as a contracting pharmacy.

WHEREAS, Pharmacy has provided notice requesting that an Affiliated Pharmacy, Physicians Rx Pharmacy LLC ("Maryland Pharmacy") be added to the PSA as an approved contracting pharmacy.

WHEREAS, Maryland Pharmacy will serve as the back-up pharmacy for the PRxP of New York dba Broadway Family Pharmacy under the PSA, for the purposes of avoiding interruption to patient care and in the event that the Pharmacy is unable to service patients due to the COVID-19 pandemic and other unforeseen circumstances.

NOW THEREFORE, in consideration of the above recitals, which are incorporated herein, Borinquen hereby approves the addition of Maryland Pharmacy as an Affiliated Pharmacy under the PSA. On or before April 15, 2020, Borinquen shall take commercially reasonable steps to add Maryland Pharmacy to the DHHS's Office of Pharmacy Affairs database and website, with the contact information set forth below, and take all necessary and required steps to obtain approval of Maryland's registration thereunder:

> **Physicians Rx Pharmacy LLC**
> **9701 Apollo Drive, #400**
> **Largo, MD 20774**
> **Registration Information:**
> **DEA FP4533130**
> **Pharmacy Contact: Chris Wakefield**
> **Title: Manager**
> **Email: cwakefield@340bpharm.com**
> **Phone: 412-357-5163**

IN WITNESS WHEREOF, the parties have executed this (Third) Pharmacy Listing Amendment, to become effective on the date executed by the parties.

**Borinquen Health Care Center, Inc.**                    **ICARE RX LLC**

Paul Carl Velez, CEO                                      Chris Wakefield, Manager

4/7/2020                                                  4/7/2020
_____                                       _____
Date                                                      Date

## FOURTH AMENDMENT TO 340B CONTRACT PHARMACY SERVICES AGREEMENT

This "Fourth Amendment" is effective as of April 3, 2020 (the "Effective Date"), between Borinquen Health Care Center, Inc./Covered Entity ("Borinquen") and ICARE RX LLC ("Pharmacy").

## RECITALS

**WHEREAS**, pursuant to the 340B Contract Pharmacy Services Agreement between Borinquen and Pharmacy, dated July 21, 2018 (the "PSA"), the pharmacy provides Borinquen services which shall include: 7. (g) payor contracting, billing and collections, account management, and other support necessary to process claims, receive reimbursements, processing of co-payments and deductibles for medications, track and manage data required to receive rebates and discounts, pay pharmacy, Covered Entity and 340B invoices on a timely basis and maintain payor relationships;

**WHEREAS**, pursuant to the 340B Contract Pharmacy Services Agreement between Borinquen and Pharmacy also provides that 7. (c) Borinquen may verify all contract debits and credits, including drug acquisition costs, distributor and manufacturer invoicing , dispensing fees and other contracted expenses; payments and credits, third-party reimbursements and payments and conduct a periodic comparison of Covered Entity's prescribing records with the dispensing records of Pharmacy and reconciliation;

**WHEREAS**, the Pharmacy and Borinquen have determined that the best and most efficient method of verifying third-party reimbursements and payments, contract debits and credits, payor contracting, billing and collections, account management, prevent diversion and otherwise track and manage data is to open joint bank accounts for Borinquen Pharmacy and iCare Rx in which all income arising from the PSA is deposited and each party is a co-signatory on each account.

PCV

CW

1

**WHEREAS**, Pharmacy and Borinquen desire to amend the PSA

**NOW THEREFORE**, in consideration of the above recitals, which are incorporated herein, and other good and valuable consideration, the parties hereto agree as follows:

When any/all payments and reimbursements arising from the 340B PSA are received by the Pharmacy and/or Borinquen from third-party payors; including insurers, State operated or funded AIDS drug purchasing assistance programs, governmental, private insurance programs, drug manufacturer patient assistance programs as well as all cash payments due from patients, including co-payments, Pharmacy and Borinquen shall deposit same into the bank account of the pharmacy which rendered the services and dispensed the drugs to the patient. Borinquen will determine, in its discretion, the financial institution at which the accounts will be opened and maintained.

**IN WITNESS WHEREOF**, the parties have executed this Amendment, effective as of the Effective Date.

Borinquen Health Care Center, Inc.                    ICARE RX LLC

Paul Carl Velez, CEO                                   Chris Wakefield, Manager

_4 / 21 / 2020_                                         _04/21/2020_

Date                                                   Date

2

# EXHIBIT

# "B"

## COVERED ENTITY FINANCING AGREEMENT

This **COVERED ENTITY FINANCING AGREEMENT** (the "<u>Agreement</u>") is made by and between BORINQUEN HEALTH CARE CENTER, INC., a Florida corporation, whose chief administrative offices are  located at 3883 Biscayne Blvd., Miami, FL  33137 (hereinafter "<u>Covered Entity</u>") and HEALTHCAP SOLUTIONS, LLC, a Delaware limited liability company, whose principal place of business is located at 1145 Broadway Street, 2nd Floor, East McKeesport, PA  15035 (hereinafter "<u>Healthcap</u>", with Covered Entity and Healthcap being referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>").

The effective date of this Covered Entity Financing Agreement shall be the same as the effective date of the Pharmacy Services Agreement between Covered Entity and ICare Rx LLC.

### Recitals

**WHEREAS**, Borinquen Health Care Center, Inc. is a Federally Qualified Health Center, a "Covered Entity" as defined in Section 340B of the Public Health Service Act ("<u>PHSA</u>") and is eligible to purchase certain outpatient drugs at reduced prices for use by Covered Entity's patients from drug manufactures who have signed a drug purchasing agreement with the United States Department of Health and Human Services;

**WHEREAS,** Healthcap is a limited liability company formed to provide financing and other services to FQHCs and other healthcare organizations;

**WHEREAS,** Covered Entity desires to engage Healthcap as its exclusive 340B financing provider to provide Covered Entity with revolving capital as needed to purchase 340B drugs for its inventory of outpatients' drugs  purchased pursuant to Section 340B.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein, the sufficiency of which the Parties acknowledge, the Parties hereto, intending to be legally bound agree as follows:

### Agreement

1.  **Inventory Financing:**

    a.    On request and based on the capital requirements of Covered Entity, from time to time, Healthcap will provide financing (each considered an "<u>Advance</u>") to Covered Entity to enable Covered Entity to purchase outpatients' drugs pursuant to Section 340B (the "<u>Drugs</u>"), with each Advance to be in an amount up to one hundred percent (100%) of the cost of such Drugs in each case as agreed by Healthcap and Covered Entity; provided, that until such time as the Drugs are dispensed, all Drugs must be kept in Covered Entity's segregated physical inventory of 340B drugs located at the duly licensed pharmacy engaged by Covered Entity to provide pharmacy services to Covered Entity's Eligible Patients (as that term is defined by applicable law) with respect to the Drugs ("<u>Contract Pharmacy</u>").

    b.    All Advances made by Healthcap to Covered Entity pursuant to this Agreement shall be due and payable in full on or before the 30th day after the date of the Advance.


PCV


1
CW

c.      Covered Entity.   So long as there is an effective 340B Pharmacy Services Agreement between Covered Entity and Healthcare Ventures Group LLC (or its affiliates and subsidiary pharmacies) or other contract pharmacies approved by Healthcap, Healthcap will have the right to be the exclusive financing entity for Covered Entity's 340B drug program.

d.      Healthcap represents that it will render the financing services under this agreement to Covered Entity for 340B drug purchases, in compliance with all laws and without regards to race, creed, color, age, sex, sexual orientation, citizenship, marital status, veteran status, national origin, disability, religion, arrest record or any other protected status of Covered Entity's patients;

2.      **Collateral; Borrowing Base:**

a.      In return for Healthcap providing capital to Covered Entity to purchase the Drugs, Covered Entity hereby pledges to Healthcap, as collateral security for its obligations under this Agreement, a first priority Lien (as defined below) and security interest in all of Covered Entity's Accounts Receivable (as defined below) relating to Drugs that have been dispensed and invoiced to patients and third party payors.

b.      Covered Entity hereby authorizes Healthcap to file one or more Uniform Commercial Code financing statements to evidence Healthcap's security interest in the Accounts Receivable described in Section 2.a above.

c.      In this Agreement, the term "Lien" means any mortgage, deed, deed of trust, pledge, hypothecation, assignment, lien, charge, claim, security interest, security title, easement or encumbrance, or preference, priority or other security agreement of any kind or nature whatsoever, and the term  "Accounts Receivable" (i) means the aggregate gross amount payable to Covered Entity for the Drugs under the Pharmacy Services Agreement with Contract Pharmacy, without giving effect to the Fee (as defined below) required to be paid by Covered Entity to Healthcap with respect to such Drugs; and (ii) excludes any accounts receivable to the extent they are subject to anti-assignment provisions under the Medicare, Medicaid or other federal or state government healthcare programs.

d.      The Accounts Receivable pledged to Healthcap hereunder shall, at all times, have an aggregate value of at least one hundred twenty-five percent (125%) of: (i) the cost of the Drugs comprising Covered Entity's 340B program inventory; plus (ii) Healthcap's Finance Charge (the "Borrowing Base"). Covered Entity shall require Contract Pharmacy to provide Healthcap with a monthly statement confirming the aggregate value of Covered Entity's virtual inventory and the physical 340B inventory  located at Contract Pharmacy, in a form and substance reasonably acceptable to Healthcap (the "Borrowing Base Certificate"); provided, that at any time following the occurrence and during the continuance of an Event of Default (as defined below), Healthcap shall be entitled to request a Borrowing Base Certificate on a more frequent basis, including daily.

e.      In the event the Borrowing Base Certificate reflects any failure by Covered Entity to meet the Borrowing Base requirements, Healthcap will notify Covered Entity of such shortfall in writing, and Covered Entity shall promptly pay Healthcap the full amount of such shortfall.


PCV


2
CW

3.      **Fee; Payment; Late Charges:**

    a.      In consideration of the financing provided by Healthcap under this Agreement, Covered Entity agrees to pay Healthcap an amount equal to two   percent (2.0%) of the funds advanced for the cost of the Drugs purchased by Covered Entity through Contract Pharmacy (the "Fee").

    b.      All Fees owed by Covered Entity to Healthcap under this Agreement shall be due and payable (together with the underlying Advances to which such Fees relate) on or before the 30th day after the date of the Advance.

    c.      Overdue amounts under this Agreement shall be subject to an additional finance charge equal to three percent (3%) until paid in full.

    d.      No provision of this Agreement shall require the payment by Covered Entity or permit the collection of interest by Healthcap in excess of the maximum amount permitted by applicable law.

4.      **Representations, Warranties and Covenants of Covered Entity:**  In consideration of the financing provided by Healthcap under this Agreement, Covered Entity represents, warrants and covenants to and for the benefit of Healthcap as follows:

    a.      Covered Entity is duly formed, validly existing and in good standing under the laws of the state or jurisdiction in which it was formed. Covered Entity has all requisite power and authority to conduct its business. Covered Entity is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required to conduct its business.

    b.      Covered Entity's chief executive office is located at the addressed listed in the introductory paragraph of this Agreement.

    c.      The individual executing this Agreement on behalf of Covered Entity has been duly authorized to do so pursuant to Covered Entity's organizational documents. This Agreement, when executed and delivered by all of the Parties, shall constitute the valid and legally binding obligations of Covered Entity, enforceable against Covered Entity in accordance with its terms.

    d.      After giving effect to the execution and delivery of the Loan Documents and the making of any disbursements under the Note, Covered Entity will not be "insolvent" within the meaning of such term as defined in Section 101 of the Bankruptcy Code.

    e.      Covered Entity is entering into this Agreement after conducting its own assessment of the alternatives available to it, and after negotiations in which it has had the opportunity to consult with assistance from competent legal counsel of its choice.

    f.      The Accounts Receivable are and will remain bona fide existing obligations created by the sale of the Drugs in the ordinary course of Covered Entity's business. Covered Entity has not received notice or otherwise learned of actual or imminent bankruptcy, insolvency or material impairment of the financial condition of any applicable account debtor regarding the Accounts Receivable. The Accounts Receivable do not result from sales to any party that is affiliated with Covered Entity or from any transaction that is not an "arm's length" transaction.

PcV
PCV



3

CW

g.     Covered Entity shall promptly provide Healthcap with such financial statements or reports as Healthcap may reasonably request from time to time.

h.     Covered Entity shall not create, incur, assume or permit to exist any Lien on Covered Entity's 340B inventory or on its Accounts Receivable, except as set forth herein, without the prior written consent of Healthcap.

5.    **Inspection; Use of Equipment:**

a.     Healthcap or its designee shall have upon reasonable notice, unimpeded access, during reasonable business hours prior to an Event of Default, and at any time on or after the occurrence of an Event of Default, to all premises where computers, books and records relating to the Accounts Receivable are kept for purposes of inspecting (and copying , after the occurrence of an Event of Default) such data, books and records. Covered Entity shall permit Healthcap or its designee to make copies of such data, books and records or extracts therefrom as Healthcap may reasonably request, at Healthcap's expense; no matter the form in which they may be kept.

b.     Upon the occurrence and during the continuance of an Event of Default, Covered Entity does hereby agree to provide Healthcap with its full cooperation, including providing unimpeded access to its personnel, physical locations or through remote computer terminal access to Healthcap so that Healthcap may access and use any of Covered Entity's equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises in connection with Healthcap's verification and/or collection of the Accounts Receivable as Healthcap (to the extent permitted by applicable law), in its sole discretion, deems appropriate, and such access and use shall be at Covered Entity's expense.

6.    **Events of Default; Remedies; Waivers by Covered Entity:**

a.     The Covered Entity understands and agrees that the occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

    i.     Covered Entity fails to pay any amount due hereunder, and such failure shall continue for a period of thirty (30) days after delivery of written notice to Covered Entity;

    ii.     any representation or warranty in this Agreement or in any written statement, report or certificate delivered by or on behalf of Covered Entity to Healthcap under this Agreement is untrue or incorrect as of the date made or deemed made, and, to the extent the same is susceptible to cure, is not cured within ten (10) days after written notice of such occurrence is sent to Covered Entity;

    iii.     Covered Entity fails or neglects to perform, keep or observe the covenant set forth in Section 4.h of this Agreement;

    iv.     Covered Entity fails or neglects to perform, keep or observe any of the covenants, promises, agreements, requirements or conditions contained in this Agreement that are applicable to it, and such failure continues for a period of thirty (30) days after written notice to Covered Entity;



PCV



4

CW

    v. any litigation or other action is commenced against Covered Entity seeking issuance of a warrant of attachment, execution, restraint or similar process against all or any part of the Accounts Receivable that results in the entry of an order for any such relief which remains unstayed or undismissed or not bonded for thirty (30) consecutive days, or Covered Entity makes or suffers a transfer of any of its assets; including its Accounts Receivable and/or any other assignment, pledge or obligation which may be fraudulent under any bankruptcy, fraudulent transfer or other creditor protection law or similar law;

    vi. a case or proceeding is commenced involuntarily against Covered Entity in a court or other tribunal seeking the appointment of a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) for Covered Entity or the reorganization or winding up or liquidation of the affairs of Covered Entity, and such case or proceeding remains undismissed or unstayed for ninety (90) consecutive days;

    vii. Covered Entity: (A) commences any case, proceeding or other action relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order entered with respect to it or seeking appointment of a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) for it or any part of its assets or properties; (B) makes a general assignment for the benefit of creditor; (C) consents to or take any action in furtherance of, or, indicating its consent to, approval of, or acquiescence in, any of the foregoing described actions; or (D) admits in writing its inability to, or shall be generally unable to, pay its debts as such debts become due;

    viii. the Lien granted or intended to be granted to Healthcap under this Agreement shall cease to be a valid and perfected first priority Lien in the Accounts Receivable; or

    ix. there is a default by either Covered Entity or Contract Pharmacy under the Pharmacy Services Agreement or any other agreement(s) between Covered Entity and Healthcap.

  b. Covered Entity further agrees that upon the occurrence and during the continuance of any alleged Event of Default, Covered Entity shall not, without the prior written consent of Healthcap: (i) grant any extension of time for payment of any of its Accounts Receivable; (ii) compromise or settle any of its Accounts Receivable for less than the full amount thereof; (iii) release in whole or in part any account debtor with respect to the Accounts Receivable; or (iv) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts Receivable.

  c. Covered Entity further understands and agrees that upon the occurrence and during the continuance of any Event of Default, Healthcap shall, in addition to all remedies conferred upon Healthcap by law or equity or by the terms of this Agreement, have the right but not the obligation to pursue any one or more of the following remedies, which shall be cumulative and not exclusive:

    i. terminate this Agreement;

    ii. declare all unpaid Advances and Fees to be immediately due and payable;

    iii. use and apply any monies deposited by Covered Entity with Healthcap, if any, regardless of the purpose for which the same was deposited, to cure any such Event of Default


PCV


5
CW

or to apply on account of any obligations due and owing by Covered Entity to Healthcap under this Agreement;

iv.     to the extent permitted by applicable law, repossess collateral through self-help, Judicial foreclosure, perfect the security interest, notify and/or communicate directly with Covered Entity's third party payors, including to notify them that the Accounts Receivable have been assigned by Covered Entity to Healthcap and that payment thereof is to be made to the order of and directly and solely to Healthcap and to verify the amount and validity of such Accounts Receivable;

v.     to the extent permitted by applicable law, receive, take, endorse, assign, deliver, accept and deposit, in the name of Healthcap or Covered Entity, any and all proceeds of the Accounts Receivable securing the obligations of Covered Entity under this Agreement or the proceeds thereof;

vi.     extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts Receivable and discharge or release any account debtor or other obligor (including filing of any public record releasing any lien granted to Covered Entity by such account debtor);

vii.     to the extent permitted by applicable law, take or bring, in the name of Healthcap or Covered Entity, all steps, actions, suits or proceedings deemed by Healthcap necessary or desirable to effect collection of or other realization upon the Accounts Receivable; and

viii.     direct Contract Pharmacy to return Covered Entity's 340B inventory back to the manufacturer or distributor of said inventory and direct manufacturer or distributor to remit the credited amounts directly to Healthcap.

d.     The proceeds of any sale, disposition or other realization upon any collateral pledged to Healthcap hereunder shall be applied by Healthcap upon receipt: (i) first to amounts required to be paid by Covered Entity under Section 7 below, if any; (ii) then to any amounts owing due to an Event of Default; (iii) then to unpaid Fees hereunder; and (iv) then to outstanding and unpaid Advances. After the indefeasible payment and satisfaction in full in cash all such amounts described above, if at all, and after the payment by Healthcap of any other amount required by any provision of law, the surplus, if any, shall be paid to Covered Entity or its representatives or to whomsoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct.

e.     Except as otherwise provided for in this Agreement and to the fullest extent permitted by applicable law, Covered Entity waives: (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of this Agreement; (ii) all rights to notice and a hearing prior to Healthcap's taking possession or control of, or to Healthcap's replevy, attachment or levy upon, any Accounts Receivable or any bond or security which might be required by any court prior to allowing Healthcap to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption laws.


PCV


6
CW

f.      Covered Entity acknowledges and agrees that the rights of Healthcap under this Agreement are commercially reasonable, appropriate, and procedurally correct; taking into consideration all of the facts and circumstances and does hereby waive any defects which may be associated with the perfection and collection of the security interests granted under the Agreement.

g.      Nothing under this Agreement shall be construed to grant Healthcap a lien or the right to enforce such a lien on any accounts receivable by Covered Entity that are subject to anti-assignment provisions under the Medicare, Medicaid, or any other federal or state government programs.

h.      Covered Entity agrees to execute such further documents as may be necessary to effectuate the purposes of this agreement.

i. No failure or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, or privilege precludes any other or further exercise thereof.

7.      **Attorneys' Fees:**

a.      Covered Entity agrees to reimburse Healthcap on demand for the actual amount of all costs and expenses, including attorneys' fees, which Healthcap has incurred or may incur: (i) in negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith; (ii) in protecting, preserving or enforcing any Lien or other right granted by Covered Entity to Healthcap or arising under applicable law, whether or not suit is brought, including but not limited to the defense of Healthcap's Lien priority; and (iii) in any way arising out of or in connection with this Agreement, and whether or not arising out of a dispute that does not directly involve Healthcap but affects its interest.

b.      The provisions of this Section 7 shall survive the expiration or termination of this Agreement.

8.      **Term; Termination:**

a.      The term of this Agreement shall commence as of the Effective Date of the Pharmacy Services Agreement between Covered Entity and ICare Rx LLC, and shall continue concurrent therewith, unless earlier terminated as provided immediately below, for a period of five (5) years (the "Initial Term").   After the Initial Term this Agreement shall automatically renew for subsequent terms of five (5) years each (each a "Renewal Term") unless earlier terminated as provided below.

b.      After the Initial Term of this Agreement, either party may terminate this Agreement without cause by giving the other Party written notice of its intent not to renew this Agreement at least ninety (90) days prior to the end of the then-current term.

c.      Either party may terminate this Agreement for material breach by the other party, provided however, that prior to any such termination, the non-breaching party shall provide written notice specifying in detail the nature of the breach and granting the breaching party sixty (60) days to effect a cure of the breach, except as otherwise provided in Section 6 of this Agreement.  If the

7


PCV


CW

breaching party cures the breach within such time period to the satisfaction of the non-breaching party, the Agreement shall not be terminated.

(i)     If the non-breaching party contends that the breach has not been cured within such time period notwithstanding the breaching party's offer of proof that the breach has been cured, then the parties agree that they shall engage in an informal settlement process whereby at least one representative of each party shall meet in person to discuss and attempt in good faith to reach a resolution of the dispute.  The meeting shall occur within ten (10) days of the date that the non-breaching party alleges that the breaching party has failed to cure the breach, unless the parties mutually agree to conduct the meeting at a later date.  Either party may request that its attorney attend the meeting in person or by telephone, and the parties may mutually agree, if they both desire, to have a practicing attorney (who is neither party's attorney) or a retired judge formally mediate the meeting, provided that the parties will equally split the mediator's costs and fees.

(ii)     In the event that the non-breaching party continues to allege a breach following the conclusion of this settlement process, then the Agreement shall be deemed terminated.

(iii)     If the breaching party refuses to engage in this settlement process as provided herein, then the non-breaching party shall have the right to immediately declare this Agreement terminated.  If the non-breaching party refuses to engage in this settlement process, then the breaching party shall have the right to declare the non-breaching party to be in material breach of the Agreement and may, at its option and without further notice or demand of any kind, terminate this Agreement; provided, however, that the non-breaching party shall not be precluded or estopped from arguing to an arbitrator, court or other adjudicating body that the other party's breach was incurable.

(iv)     Nothing in this section shall affect or impede either party's right to file litigation or arbitration demand, except that prior to filing as the result of an alleged breach of the Agreement, the party alleging the breach must comply with this section 8(c).

(v)     Nothing in this section shall affect or impede Healthcap's rights under Section 6 of this Agreement.

d.     Either party may also terminate this Agreement, effective immediately upon the giving of written notice, if the other shall: (a) suspend or discontinue its business operations; (b) file or have filed against it a petition in bankruptcy which is not dismissed within sixty (60) days of filing, or be adjudicated bankrupt; (c) make a general assignment for the benefit of its creditors; (d) be voluntarily or involuntarily dissolved or have a receiver, trustee, or other court officer appointed with respect to its property which is not dismissed within sixty (60) days of appointment; or (e) be disbarred or suspended from participation in Medicare, Medicaid or any other state of federal health care payment program.  Covered Entity shall provide immediate notice to Healthcap if Covered Entity is no longer deemed to be a 340B Covered Entity, or is otherwise excluded from the 340B program, which notice immediately terminates this Agreement.  Nothing in this section shall affect or impede Healthcap's rights under Section 6 of this Agreement.



PCV

8



CW

e.     Upon any termination or expiration of this Agreement, all rights and obligations of the parties shall cease except: (i) those rights and obligations that have accrued and remain unsatisfied prior to the termination or expiration of this Agreement; (ii) those rights and obligations that survive termination or expiration of this Agreement; and (iii) the party's respective professional ongoing obligations, if any, with respect to any patients.

f.     Notwithstanding the foregoing, this Agreement shall automatically terminate on the date of expiration or termination of the 340B Contract Pharmacy Services Agreement between Covered Entity and Healthcare Ventures Group LLC (or its affiliates and subsidiary pharmacies), unless the Parties agree otherwise.

9.    **Confidentiality:** Each Party agrees to protect the confidentiality of the other Party's records and business information disclosed to it and not to use such information other than as necessary and appropriate in connection with performance of this Agreement. Each Party acknowledges that disclosure of confidential information of the other would cause the other Party irreparable harm and may, without limiting the remedies available for such breach, be enjoined at the instance of the harmed Party. Upon termination or expiration of this Agreement, each Party agrees to cease use of the other's information and to return it, or destroy it, as appropriate.

10.    **Indemnification:** Covered Entity agrees to indemnify Healthcap against and to save Healthcap harmless from any and all suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) arising from or relating to this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), including any breach by Covered Entity of its representations, warranties and covenants under this Agreement.

11.    **Limitation of Liability:** In no event will Healthcap be liable to Covered Entity for any lost profits, lost savings or other consequential, incidental or special damages resulting from or arising out of or in connection with this Agreement or the transactions or relationships contemplated hereby, even if Healthcap was advised of the possibility of such damages.

12.    **Choice of Law; Jurisdiction and Venue; WAIVER OF JURY TRIAL:**

a.     This Agreement shall be governed by and interpreted and enforced in accordance with the internal laws of the State of Delaware, without regard to the conflicts or choice of law provisions of any jurisdiction  that would require the application of the laws of any other jurisdiction; provided, that with respect to the creation, perfection, priority and enforcement of Healthcap's Lien in the Accounts Receivable evidenced by any UCC Financing Statement, and the determination of deficiency judgment, the laws of the state or jurisdiction where the UCC Financing Statement was made shall apply.

b.     The Parties agree that any suit, action or proceeding arising hereunder shall be instituted in, and each such Party hereby submits to the personal jurisdiction of, any state or Federal court sitting in the County of Miami-Dade, FL . The Parties further: (i) agree that all claims in respect of any such suit, action or proceeding may be heard and determined in, and enforced in and by, any such court identified above; (ii) waive any objection they may now or hereafter have to venue in any such court or that such court is an inconvenient forum; and (iii) agree to service of process.

PCV
_____
PCV



9

CW
_____
CW

c.      The Parties further agree that, in the event a dispute arising under this Agreement is proceeding concurrently as a dispute involving the 340B Contract Pharmacy Services Agreement between Covered Entity and Healthcare Ventures Group LLC (or its affiliates and subsidiary pharmacies) and such dispute is by prior agreement of the parties being resolved through arbitration, the Parties may also agree to have a dispute arising under this Agreement resolved in the same arbitration forum.  In that situation, the terms and conditions of said 340B Contract Pharmacy Services Agreement shall be deemed incorporated into this Agreement.

d.      THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN HEALTHCAP AND COVERED ENTITY ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO.

13.     **Binding Agreement; Assignment:** This Agreement shall be binding upon and shall inure to the benefit of the Parties. This Agreement may be assigned or any portion of this Agreement may be delegated by Healthcap to any third party capable and competent to perform same,  upon written notice to Covered Entity. This Agreement may not be assigned by Covered Entity to any third party without the prior written consent of Healthcap.

14.     **Entire Agreement; Amendment:** This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all prior or contemporaneous discussions, representations, correspondence and agreements, whether oral or written, pertaining thereto. This Agreement may be amended or modified only by a writing duly executed by both Parties.

15.     **Severability:** If any term or provision of this Agreement is held invalid or unenforceable to any extent, the remainder of this Agreement will not be affected thereby and each term and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law, unless doing so will materially alter the rights or obligations of either Party.

16.     **Notices:** Formal notices or communications of material breaches to be given under this Agreement will be given to the respective Parties in writing and shall be deemed given one (1) business day after delivery to the address provided  by the Parties in this Agreement. Informal, non-substantive communications, requests or notices may be provided via electronic mail.

17.     **Counterparts; Delivery:** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which, when taken together, shall constitute one and the same agreement. Delivery of an executed counterpart by attaching a signature in portable document format (.pdf) via electronic mail shall constitute delivery of an original signature.

18.     **Exclusivity:**

a.      During the term of this Agreement, unless otherwise agreed to by the parties, Healthcap shall have sole and exclusive rights and authority to provide the financing services described herein to Covered Entity (including any agents, affiliates, successors, or licensees). Furthermore, unless and otherwise agreed to by the Parties, Covered Entity shall not enter into a


PCV


10
CW

contract pharmacy services agreement or open/operate an in-house pharmacy for servicing the Eligible Patients in connection with the Drugs unless Healthcap gives its written consent; provided, however, that a patient's freedom to choose his or her own provider of pharmacy services shall in no way be limited.

   b.  Insofar as Covered Entity has entered into any other financing agreements for the Drugs, Covered Entity must immediately take all necessary steps to terminate such agreements. Covered Entity's failure to accomplish a termination of other financing agreements for the purchase of 340B Drugs in a prompt and timely fashion shall constitute a material breach of this Agreement. Furthermore, if this Agreement is (or does not become) effective or enforceable for any reason, Pharmacy shall still retain the right to allege material breach of the exclusivity provision of the original Financing Agreement in the event that Covered Entity does not terminate other financing agreements for 340B Drugs.

[Signature page follows.]



PCV



11

CW

IN WITNESS WHEREOF, the parties agree to the foregoing terms of this Agreement through the execution below by their respective, duly authorized representatives effective as of the Effective Date.

**BORINQUEN HEATH CARE CENTER, INC.**

**HEALTHCAP SOLUTIONS, LLC**

By: _Paul Care Velez_
Paul C. Velez, CEO

By: _Chris Wakefield_
Chris Wakefield, Manager

Date: _7/25/18_

Date: _7/21/2018_

Healthcare Ventures Group LLC and its subsidiary pharmacies agree to provide Borrowing Base Certificates to Healthcap as described pursuant to this Agreement:

**Healthcare Ventures Group LLC**

By: _Chris Wakefield_
Chris Wakefield, Manager

Date: _7/21/2018_

PCV

12
CW